| | | |
|---|---|---|
| Peerless Network, Inc. *et al.*, | ) | |
| | ) | No. 14 C 7417 |
| Plaintiffs – Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| MCI Communication Services, Inc., | ) | |
| Verizon Services Corp. and Verizon Select | ) | |
| Services Inc., | ) | |
| | ) | |
| Defendants – Counterclaim Plaintiffs. | ) | |

## MEMORANDUM OPINION AND ORDER

Peerless Network, Inc., et. al., ("Peerless"), sued the Defendants MCI Communication Services, Inc., Verizon Services Corp., and Verizon Select Services, Inc., (collectively "Verizon"), alleging claims of breach of contract, breach of tariffs, breach of implied contract, unjust enrichment, quantum meruit, and seeking declaratory judgments. Verizon filed four counterclaims against Peerless alleging breach of federal and state tariffs. This matter is before the Court on Verizon's motion to dismiss Counts I-II and VI-X, in full, and Counts III-V and XI-XII, in part, of Peerless's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 28. For the following reasons, the Court grants the motion in part and denies the motion in part.

## Background

Peerless and Verizon are both telecommunications carriers that provide a variety of telecommunication services. R. 1 ¶¶ 7-8. Telecommunication services in the United States can be divided into two categories: (1) local exchange services and (2) interexchange services. *Id.* ¶ 15. Local exchange services involve phone calls that originate when the calling party dials the call in one exchange service area and terminate when the call is delivered to the receiving party in the same exchange service area. *Id.* Interexchange services involve phone calls that originate in one exchange area and terminate in a different exchange area. *Id.* Interexchange services can be intrastate or interstate. *Id.* Intrastate services are calls exchanged in the same state. *Id.* Interstate services are calls exchanged between multiple states. *Id.*

Many telecommunication carriers provide both local exchange and interexchange services. *Id.* ¶ 16. "Local Exchange Carriers" ("LECs") are carriers that provide local exchange services. *Id.* For purposes of this action, Verizon's local affiliates and Peerless are LECs. *Id.* "Interexchange Carriers" ("IXCs") are carriers that provide interexchange services. *Id.* For the purposes of this action, Verizon functions as an IXC. *Id.* ¶ 9.

The Federal Communications Commission ("FCC") adopted a compensation structure that requires LECs to allow IXCs to use their telephone lines to originate and terminate calls so all carriers can exchange calls between their customers. *Id.* ¶ 18. IXCs are required to compensate LECs for their use of LECs' telephone lines. *Id.* Peerless provides an example of how LECs and IXCs collaborate on long distance

phone calls:

> When a consumer makes an interexchange call, the consumer's LEC originates the call, and performs transport and switching functions and delivers the call (i.e., "hands the call off") to an IXC, and the IXC then hands off the call to the terminating LEC so that the call can be delivered to the called party. A common example of [this] would be a long-distance call from Chicago to St. Louis. In that example, AT&T Illinois (the incumbent LEC in Chicago) performs switching functions and originates the call on its network, and hands over the call to an IXC, such as Sprint Long-Distance, which carries the call to St. Louis. Sprint then hands off the call off to AT&T Missouri (the incumbent LEC in St. Louis), which performs transport and switching functions and carries the call across its network to deliver the call to the called party.

*Id.* ¶ 19. In this example, Sprint (the IXC) must compensate AT&T (the LEC) because AT&T performed switched access service by carrying the customer's call on Sprint's phone lines. *Id.* ¶ 20. IXCs are required to pay LECs "access charges" for "originating" and "terminating" the phone calls. *Id.* These access charges are set forth in negotiated contracts between IXCs and LECs, tariffs on file with the FCC, and tariffs on file with state public service commissions. *Id.*

The types of services that LECs provide to IXCs vary depending on need and function. *Id.* ¶ 26. For example, an IXC can use an LEC's tandem switch (the telephone switch that connects LEC switches to IXC switches) or an LEC's end office switch (the telephone switch that connects LEC switches to the customer's phone) to reach the end customer. *Id.* An IXC can also use an LEC's physical infrastructure (e.g., fiber optic cables) or electronic database to carry the call to and from the tandem or end office switch, which is known as "transport services." *Id.* These services are collectively known as "access services." *Id.*

On February 11, 2009, Peerless and Verizon entered into a contract

("Switched Access Agreement") under which Peerless agreed to provide access services to Verizon in certain markets. *Id.* ¶¶ 35-36. Section 3 of the Switched Access Agreement spells out the types of interstate and intrastate access service Peerless was to provide Verizon. *Id.* ¶ 36. Since February 11, 2009, the parties have amended the Switched Access Agreement four times, most recently on October 9, 2013. *Id.* ¶ 35.

The Switched Access Agreement states that any services or charges it does not govern "are subject to the applicable Peerless tariffs." R. 1-1 at 4. The FCC requires telecommunication carriers to file tariffs with the FCC that publicly display the carriers' rates for interstate and foreign telecommunication services. 47 U.S.C. § 203. Peerless filed its initial interstate access tariff with the FCC in June 2008. R. 1 ¶ 39. It subsequently cancelled and replaced the tariff three times to reflect its modified rates. *Id.*

Historically, the FCC has exercised jurisdiction over interstate calls, while each individual state's public service commission has exercised jurisdiction over intrastate calls. *Id.* ¶ 17. Generally, public service commissions require carriers to file intrastate tariffs just as the FCC does. *Id.* ¶¶ 20, 42-43. Peerless filed state tariffs with the proper public service commissions in those states where it provided intrastate access services to Verizon. *Id.* ¶ 42.

In 2013, the relationship between Peerless and Verizon broke down because Verizon disputed its bills from Peerless for switched access charges and Peerless alleged Verizon wrongfully disputed its billings. R. 29-1 at 2. On September 18, 2013, in an effort to reach an accord on Verizon's outstanding payments to Peerless,

the parties entered into a new contract ("Standstill Agreement") to attempt to resolve their disputes without litigation. *Id.* Specifically, the parties created the Standstill Agreement to address Verizon's unpaid access charges under Peerless's tariffs and the Switched Access Agreement. *Id.*

In its complaint, Peerless alleges that it properly billed for the services it provided to Verizon pursuant to the Switched Access Agreement, its federal tariffs, and its state tariffs. R. 1 ¶¶ 34-36, 44-45. Peerless claims Verizon refused to make full payment for the interstate and intrastate access services Peerless provided to Verizon. *Id.* ¶¶ 47-48. Specifically, Peerless's complaint alleges Verizon refused to pay for three types of calls: (1) calls for which Peerless provided end office switching and transport services to deliver long distance calls to Verizon customers; (2) calls for which Peerless provided end office switching and transport services to deliver long distance calls originated by Verizon's customers; and (3) calls for which Peerless provided end office switching, but not transport services, to deliver long distance calls to Verizon's toll-free customers. *Id.* ¶ 34.

Verizon admits that it disputed and withheld some payments owed to Peerless pursuant to Peerless's federal and state tariffs. R. 27. Verizon argues it does not owe Peerless the withheld amounts because Peerless: (1) improperly billed Verizon its tariffed end office switched access rate for calls that were routed over the internet; (2) engaged in traffic pumping[1] by charging a federal tariffed end office

---

[1] Traffic pumping, also known as access stimulation, is the practice of a competitive local exchange carrier ("CLEC") generating large volumes of long distance calls for the purpose of collecting switched access revenues, which it shares with its purported customers. R. 27 at 37 ¶ 16. A carrier satisfies the elements for traffic pumping if it

switched access rate that exceeds permissible rates in Illinois; and (3) improperly billed Verizon its tariffed terminating switched access rate for international calling card services where an international telephone company—not Peerless—terminated the call. *Id.* at 36-38.

Furthermore, Verizon argues that the three types of calls at issue in Peerless's complaint are not covered by any provision of the Switched Access Agreement. *Id.* at 12, 16, 18. Verizon argues the three types of calls only involve end office switching services, whereas the Switched Access Agreement governed tandem switching services. R. 29 at 6-7.

Peerless also alleges that Verizon breached the Standstill Agreement by refusing to pay for access service charges due under that agreement. *Id.* ¶¶ 50-51. Peerless asserts that Verizon refused to pay for access service charges due under the Standstill Agreement because it disputes charges it previously paid under the Switched Access Agreement—before the Standstill Agreement went into effect. *Id.* Peerless argues this "clawing back" of previously paid payments violates the Standstill Agreement. *Id.*

Finally, Peerless alleges that Verizon continues to receive access services

---

has one or more access revenue sharing agreements and its ratio of terminating to originating traffic exceeds a certain number. *See* 47 C.F.R. § 61.3(bbb)(1).

LECs are divided into competitive local exchange carriers ("CLEC") and incumbent local exchange carriers ("ILEC"). ILECs are usually the monopoly LEC in a geographic location, and CLECs are ILEC's "rivals" who are competing in the same market. *See Illinois Bell Tele. Co. v. Box*, 526 F.3d 1069, 1070 (7th Cir. 2008). Peerless describes its subsidiaries as CLECs, R. 1 ¶ 7, but for the purposes of this motion, the distinction between a CLEC, ILEC, and LEC is irrelevant.

from Peerless that are covered by the Switched Access Agreement, its federal tariffs, and its state tariffs that Verizon refuses to pay for, thereby improperly receiving a benefit. *Id.* at ¶¶ 52-53, 57, 63, 71, 76, 81. Peerless alleges that Verizon's refusal to pay for such access services has damaged Peerless in excess of $1,000,000, an amount which continues to accrue each month. *Id.* ¶ 54.

## Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See*, *e.g.*, *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft*, 556 U.S. at 678 (*quoting* Twombly, 550 U.S. at 570). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

**Analysis**

### I. Peerless Sufficiently Pleads a Cause of Action for Breach of the Switched Access Agreement.

In Counts I-II, VI-IX, XI, and XII, Peerless alleges that Verizon breached the Switched Access Agreement by failing to pay originating and terminating access service charges set forth under the Switched Access Agreement. R. 1 ¶¶ 58-60. Verizon moves to dismiss Counts I and II in full and Counts VI-IX, XI, and XII in part. R. 29. Verizon claims Peerless did not plead Verizon's alleged breach of the Switched Access Agreement with the required specificity. *Id.*

To state a cause of action for a breach of contract under Illinois law, a plaintiff must allege four elements: (1) a valid and enforceable contract exists, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages resulting from defendant's breach. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citations omitted). There is no dispute that the Switched Access Agreement is a valid and enforceable contract. Peerless has also sufficiently pled damages by alleging that Verizon refused to pay for three types of calls covered under the Switched Access Agreement, resulting in damages in excess of one million dollars. R. 1 ¶ 54.

Verizon argues that Peerless's breach of contract claim fails for two reasons. First, Verizon disputes that the end office switching services for which Verizon allegedly owes payment are covered by the Switched Access Agreement. R. 29. Verizon argues that the three types of calls in dispute that are described in Peerless's complaint do not involve any type of tandem switching service. *Id.* Verizon interprets

8

the Switched Access Agreement to govern only Peerless's tandem switching services to Verizon, not its end office switching services. *Id.* at 6-7. According to Verizon, the only form of service Peerless provides Verizon in those three types of calls is end office switching. *Id.* Thus, Verizon argues Peerless has not alleged that Verizon failed to pay for a service under the Switched Access Agreement. *Id.*

Peerless disputes this argument. While it does not explicitly argue that the Switched Access Agreement covers only tandem services, it contends that the services it provided Verizon with respect to the three types of calls included tandem service functions that are covered by Section 3 of the Switched Access Agreement. R. 39 at 4-5. Peerless argues that some of the functions it performed in completing the three types of disputed calls are functions covered by Section 3 of the Switched Access Agreement—including services that may be tandem switching services. *Id.* at 5. Peerless calls Verizon's argument that the complaint—in referring to the disputed calls—only identifies tariffed end office switching services, "disingenuous." *Id.*

Despite its assertion that it provided tandem services that are covered by the Switched Access Agreement, Peerless admits it cannot identify without more discovery the specific services it provided on each call and whether the service created a charge due under the Switched Access Agreement or instead, under one of Peerless's tariffs. *Id.* at 4. At oral argument before the Court on February 12, 2015 and in its response, Peerless stressed that the nature of phone records makes it difficult at this stage of litigation to determine what function Peerless provided on each call. *Id.* However, Peerless argues that through discovery, it can examine records to determine what functions were provided, the appropriate rate for those functions,

and which charges Verizon owes Peerless for those functions under the Switched Access Agreement. *Id.*

Because the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of Peerless, the Court finds that Peerless has sufficiently pled that the Switched Access Agreement governs at least some of the unpaid tandem services Peerless provided to Verizon. *Mann*, 707 F. 3d at 877. R. 1 ¶ 36. Peerless alleges that the Switched Access Agreement covers "certain interstate and intrastate access service[s]" Peerless was to provide to Verizon. Section 3 of the Switched Access Agreement describes the access service functions that Peerless provided to Verizon and Peerless has sufficiently pled that at least some of the unpaid services Peerless provided to Verizon are covered by the functions in Section 3. Furthermore, the discovery process will enable Peerless to investigate and identify with specificity which charges are allegedly due under the Switched Access Agreement.

As its second ground for dismissing Peerless's claim that it breached the Switched Access Agreement, Verizon argues that Peerless has not provided fair notice of which unpaid charges violated the Switched Access Agreement because Peerless has not pled which provisions of the Switched Access Agreement Verizon allegedly violated. R. 29. Peerless argues that it does not need to recite "verbatim" the contract provisions that Verizon breached in order to properly state a claim. R. 39 at 6.

While Peerless attached the Switched Access Agreement to its complaint, it did not identify specific provisions that Verizon allegedly breached. The law on the issue of whether it is necessary to cite specific contract provisions to state a claim for

breach of contract is divided in this district. *See e.g.*, *Int'l Capital Group v. Starrs*, No. 10 C 3275, 2010 WL 3307345, at *1 (N.D. Ill. Aug. 19, 2010) (noting that judges in this district have "come out both ways" whether a complaint must identify a particular contract provision that was breached before concluding that a plaintiff "is not required to identify a specific contract provision that was breached in order to plead breach of contract under the federal pleading standard, but a plaintiff must still plead enough facts to establish a breach, for example, the existence of some unsatisfied obligation"); *Urlacher v. Dreams, Inc.*, No. 09 C 6591, 2010 WL 669449, at *2 (N.D. Ill. Feb. 22, 2010) ("[Plaintiff] is not required at the pleading stage to identify the exact provision of the Agreement that [Defendant] violated."); *Carlson v. Nielsen*, No. 13 C 5207, 2014 WL 4771669, at *4 (N.D. Ill. Sept. 24, 2014) (citing *Urlacher*, 2010 WL 669449, at *2 for the same proposition); *see also Cont'l Cas. Co. v. Duckson*, No. 11 C 00459, 2011 WL 2293873, at *3 (N.D. Ill. June 9, 2011); *but see Gandhi v. Sitara Capital Mgmt., LLC*, 689 F. Supp. 2d 1004, 1016 (N.D. Ill. 2010) ("By not identifying in their complaint the provision of the [contract] allegedly breached, plaintiffs fail to satisfy" the low threshold in Rule 8(2)(a).); *Burke v. 401 N. Wabash Venture, LLC*, No. 08 C 5330, 2010 WL 2330334, at *2 (N.D. Ill. June 9, 2010) ("The Court fails to see how, post-*Iqbal*, a plaintiff could state a claim for breach of contract without alleging which provision of the contract was breached.").

The Court finds useful the analysis in *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 589 F. Supp. 2d 987, 991 (N.D. Ill. 2008), in which the court denied defendant's motion to dismiss for failure to specify the contractual provision the plaintiff allegedly breached. *In re Ameriquest* involved a contractual dispute

between the plaintiff mortgage company and a group of mortgage broker defendants who allegedly failed to comply with contractual duties when closing mortgage loans. *Id.* at 989. The plaintiff did not cite contract provisions in its complaint because there were hundreds of contracts at issue. *Id.* at 990. Instead, the plaintiff created a chart summarizing the information for each contract that the defendants allegedly breached (i.e., names of relevant borrower plaintiffs who had sued Ameriquest, case information for those underlying suits, third-party defendants involved in disputed transactions, and approximate dates of agreements between the third-party defendants). *Id.* at 990-91. The court held that although the complaint and accompanying chart did "not offer much detail on the terms of the contracts," it still "plainly allege[d] [the] Third Party Defendants had a contractual duty to provide" services to the plaintiff. *Id.* at 991. The court further noted that the complaint's allegations were "sufficient to give Third Party Defendants fair notice of the contract actions against them and enable them to conduct a meaningful investigation into such claims and possible defenses." *Id.* While *In re Ameriquest* is not controlling, it is persuasive. *Estate of Warner v. U.S.*, 743 F. Supp. 551, 556 (N.D. Ill. 1990) ("though it is true that District Court decisions . . . do not constitute binding precedent, they *can* of course be persuasive") (emphasis in original).

Verizon cites three cases where the court required the plaintiffs to identify specific contract provisions to state a claim for breach of contract. *Tsitsopoulou v. Univ. of Notre Dame*, No. 2:10–CV–309, 2011 WL 839669, at *5 (N.D. Ind. Mar. 7, 2011); *GKP, LLC v. Wells Fargo & Co.*, No. 1:13 CV 01482, 2013 WL 5353799, at *3 (N.D. Ohio Sep. 24, 2013); *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358-59

(S.D.N.Y. 2001). All three cases are distinguishable and outside of this district.

In *Wells Fargo*, the plaintiff did not attach to the complaint the loan agreement on which the breach of contract claim was premised. 2013 WL 5353799, at *1. The plaintiff did not specify any terms of the contract or specify any terms that the defendant allegedly breached. *Id.* Additionally, plaintiff's counsel admitted to never having seen a copy of the loan agreement, and defendant's counsel also did not possess a copy of the agreement. *Id.*

In *Tsitsopoulou*, the plaintiff filed suit against the University of Notre Dame for wrongful termination. 2011 WL 839669, at *1. The defendant attached a copy of the plaintiff's most recent employment contract (referenced in her complaint), but the Court held it was "undisputed" the contract was already terminated. *Id.* at *1 n. 2, *5. The plaintiff then attempted to base her argument in response to the defendant's motion to dismiss on Notre Dame's Faculty Handbook, which she did not attach to her complaint. *Id.* The court rejected the plaintiff's "convoluted argument" that the University breached a "contract" by not following a provision in the Faculty Handbook. *Id.* The court dismissed the plaintiff's breach of contract claim because "most importantly," the plaintiff's complaint only referred to a terminated employment contract. *Id.* The court held the plaintiff could not claim in her response that the breach of contract was based upon a different document than the one referenced in her complaint. *Id.*

In *Wolff*, although the plaintiff attached the contract to his complaint, the court dismissed the plaintiff's breach of contract claim because the plaintiff failed to identify the contract provisions at issue. 171 F. Supp. 2d at 358. However, that case

came out of the Southern District of New York and cited another New York district court case for its contention that plaintiffs are required to cite the contract provisions. *Id.* at 358 (citing *Levy v. Bessemer Trust Co., N.A.,* No. 97 Civ. 1785 (JFK), 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)). As noted, this district has been inconsistent with respect to that issue. *Starrs*, 2010 WL 3307345, at *1. Additionally, the *Wolff* court cited the fact that the plaintiff failed to provide the defendant notice of the nature of its alleged breach. *Id.* at 358-59.

Verizon's cited authority is unavailing. As articulated in Peerless's complaint, Peerless and Verizon's history of conducting business together since 2008 renders less plausible Verizon's claim it does not know how it breached the Switched Access Agreement. *See* R. 39. Additionally, both parties previously attempted to settle their dispute over payments under the Switched Access Agreement and Peerless's tariffs through the Standstill Agreement. Most recently, during oral argument on February 12, 2015, Verizon's counsel admitted that there had been correspondence between the two parties over the disputed charges stemming from the Switched Access Agreement in Peerless's complaint. Also, Verizon can use contention interrogatories or requests to admit in order identify the specific provisions at issue.

Therefore, the Court finds that Peerless has sufficiently pled a claim for a breach of contract under Illinois law and denies Verizon's motion to dismiss Counts I-II in full and XI-XII in part. *Reger Dev.*, 592 F.3d at 764; *Mann*, 707 F.3d at 877. Although Peerless does not specify what provisions of the Switched Access Agreement Verizon allegedly breached, Peerless alleges sufficient facts to put the defendants on notice of their alleged breach of the Switched Access Agreement. R. 1 ¶ 34. Peerless

describes the services it provided in the three types of calls it believes are covered under the Switched Access Agreement that Verizon refused to pay for and attaches the Switched Access Agreement to its complaint. *Id.* ¶¶ 34, 37. Peerless has thus alleged enough facts to put Verizon on fair notice of the "contractual duty" it breached. *In re Ameriquest*, 589 F. Supp. 2d at 991. Peerless does not need to be anymore specific at this stage of litigation. *See Dempsey v. Nathan*, No. 14 CV 812, 2014 WL 4914466, at *8 (N.D. Ill. Sept. 30, 2014); *In re Ameriquest*, 589 F. Supp. 2d at 989; *Urlacher*, 2010 WL 669449, at *2; *Starrs*, 2010 WL 3307345, at *1.

Of course, moving forward in proving its claims, Peerless will be required to respond to Verizon's discovery requests related to the breach of the Switched Access Agreement in compliance with Rule 26 of the Federal Rules of Civil Procedure.

## II.   Peerless Fails to Sufficiently Plead a Cause of Action for Breach of the Confidential Standstill Agreement.

In Count X, Peerless alleges that Verizon breached the Standstill Agreement in three ways: (1) refusing to pay access service charges billed by Peerless since the effective date of the Standstill Agreement; (2) disputing previously made payments for access service charges with no proper or legal justification; and (3) clawing-back previously paid access charges by not paying for current charges. R. 1 ¶ 132. In other words, Peerless alleges that Verizon attempted to recoup its prior payments for access services charges from before the creation of the Standstill Agreement, and by not paying access service charges due after the creation of the Standstill Agreement, tried to "claw back" those payments. R. 39. Verizon moves to dismiss Count X because Peerless has not identified any specific provisions of the Standstill

Agreement that Verizon allegedly breached. R. 29.

The only element in dispute is whether Verizon breached the Standstill Agreement.[2] Peerless alleges that Verizon's practice of clawing back prior payments breached Section 2(b) of the Standstill Agreement. R. 39. Section 2(b) states:

> Peerless may continue to bill Verizon for certain intercarrier compensation charges that it contends in good faith apply to services rendered by Peerless to Verizon (the "Peerless New Charges"), and Verizon shall pay any such charges that are not subject to a good faith dispute, but Verizon may dispute and withhold payment of any such charges as to which Verizon brings a good faith dispute. Verizon shall state with specificity the basis of any good faith dispute (*e.g.* that the charges do not apply given the nature of the jurisdiction, that the call detail records do not support the charge or that the charges are inconsistent with law).

R. 29-1 at 3. Peerless argues that Verizon's claw-back of prior payments violated this section of the Standstill Agreement because Verizon withheld payment with "no proper or legal justification." R. 1 ¶ 132.  Peerless argues "Verizon's bad faith conduct is clearly described in [¶ 132]" of its complaint. R. 39 at 9. Thus, Peerless argues that they have pled enough facts to allege that Verizon breached Section 2(b) of the Standstill Agreement. *Id.*

Verizon argues that Peerless fails to allege any facts indicating "that Verizon's disputes and refusals to pay post-agreements invoices were raised in bad faith." R. 29 at 8. Verizon argues that the Standstill Agreement was silent with

---

[2] The elements of a contract under New York law, which, as Verizon points out in reply, governs the Standstill Agreement, R. 29-1 at 6, are the same as those under Illinois law. *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379 (S.D.N.Y. 2014) (noting that the elements of breach under New York law—contract existence, performance, breach, and damages—are well established).

respect to Verizon's ability to dispute charges on previously paid bills that were invoiced *before* the Standstill Agreement went into effect. *Id.* at 7-8. Thus, Verizon argues the Standstill Agreement did not bar Verizon from "withhold[ing] payments to recoup past overpayments." *Id.* at 8. Consequently, Verizon argues that Peerless's complaint is deficient because it does not identify a provision of the contract Verizon allegedly breached. *Id.*

For this count, the Court finds that Peerless fails to properly state a claim that Verizon breached the Standstill Agreement. The conduct Peerless alleges does not violate Section 2(b) of the Standstill Agreement. By its plain language, Section 2(b) allows Verizon to dispute in good faith access service charges that Peerless billed. R. 29-1. Nothing on the face of the Standstill Agreement prohibits Verizon from disputing charges paid before the effective date of the Standstill Agreement. R. 29-1; *see Villa Health Care, Inc. v. Illinois Health Care Mgmt. II, LLC*, No. 12–3205, 2013 WL 3864418, at *2 (N.D. Ill. July 25, 2013) ("If the contractual language is unambiguous, then the court will . . . interpret the contract according to its plain meaning"). Furthermore, Peerless's only allegation that Verizon withheld the "clawed back" charges in bad faith is that Verizon had "no proper or legal justification" to claw back prior payments. R. 1 ¶ 132. Without more, this is a conclusory allegation that is insufficient to state a claim for breach of contract. *Twombly*, 550 U.S. at 555 ("labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

Therefore, the Court grants Verizon's motion to dismiss Count X for failure to state a claim for breach of the Standstill Agreement. The Court dismisses Count X

without prejudice.

## III. The Filed Rate Doctrine Bars Peerless's Equitable Causes of Action.

In Counts VI-IX, Peerless asserts four equitable causes of action in the alternative in the event the Court finds the Switched Access Agreement and Peerless's tariffs do not apply to cover the services involved with the calls at issue in the breach of contract claim. R. 1 ¶¶ 86, 100, 114, 122. Counts VI and VII assert a cause of action for breach of an implied contract; Count VIII asserts a cause of action for unjust enrichment; and Count IX asserts a cause of action for quantum meruit. *Id*.

Verizon argues that if the Court finds the charges in Counts VI-IX fall outside of the Switched Access Agreement and Peerless's tariffs, then the filed rate doctrine bars Counts VI-IX as a matter of law. R. 29 at 11. The filed rate doctrine forbids courts from determining the reasonableness of a tariff rate, altering a rate filed with a regulatory agency, or awarding a plaintiff damages that are different from a filed rate. *See e.g.*, *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011).

Verizon argues the filed rate doctrine bars Peerless's equitable causes of action in light of the FCC's decision in *AT&T Corp. v. All American Tele. Co.*, 28 F.C.C. Rcd 3477, 3493-94 (rel. Mar. 25, 2013), subsequent to which federal district courts have dismissed equitable claims whether or not the charges at issue are covered by a negotiated contract or valid tariff. *See e.g.*, *XChange Telecom Corp. v. Sprint Spectrum L.P.*, No. 1:14-cv-54, 2014 WL 4637042, at *1 (N.D.N.Y. Sept. 16, 2014); *CallerID4u, Inc. v. MCI Commc'ns Servs., Inc.*, No. 14 CV 654, at 42 (W.D.

18

Wash. Nov. 5, 2014) (R. 29, Ex. 3); *see also Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No. 3:10-CV-1897-D, 2012 WL 2995063, at *11 (N.D. Tex. July 23, 2012) (granting summary judgment that filed rate doctrine bars unjust enrichment claim because "charging for switched access services without a filed interstate tariff or negotiated contract constitutes an unjust and unreasonable charge under [47 U.S.C. 23] § 201(b)").

In *XChange*, the plaintiff, a CLEC, sued the defendant, an IXC, for unpaid interstate and intrastate access charges under numerous causes of action including breach of contract, breach of federal and state tariffs, unjust enrichment, and breach of implied contract. 2014 WL 4637042, at *1. The plaintiff sought to recover charges for access services provided before it filed a tariff and for those provided after its tariff was on file with the FCC. *Id.* at *2-3. The parties did not have a contract governing the access services at issue. *Id.* The plaintiff argued that the law did not bar pleading an unjust enrichment or quasi-contract claim for those services provided before it filed the tariff because the defendant unjustly benefited from plaintiff's services without payment. *Id.* at *5. The court rejected the plaintiff's argument and granted the defendant's motion to dismiss the claim for charges before the filing of the tariff "[b]ecause carriers are obligated under the [FCA] and FCC interpretations to either submit schedules setting forth the applicable rates for interstate access charges . . . or negotiate such rates directly with other carriers." *Id.* at *6. The plaintiff was unable to "avoid these requirements by instead asserting equitable claims for unpaid charges." *Id.*

In *CallerID4u*, the plaintiff, a CLEC, sought to recover unpaid access service

charges from the defendant, an IXC, for a time period prior to when the plaintiff filed its tariff. No. C14-654-TSZ, at 39-40. The court held the plaintiff could not recover under implied contract, quantum meruit, or any other equitable claim because the filed rate doctrine preempted the equitable claims. *Id.* at 42. The court cited *All American*, which held that "unless a carrier files a valid interstate tariff under Section 203 of the [FCA], or enters into contract which have been interpreted as negotiated contracts with [interexchange carriers] for the access services, it lacks authority to bill for those services." *Id.* (citing 28 F.C.C. Rcd at 3493-94). Thus, the court granted the defendant's motion to dismiss because the filed rate doctrine prohibited the plaintiff from recovering unpaid access charges before the plaintiff filed its tariff. *CallerID4u*, No. C14-654-TSZ, at 42.

Peerless argues the filed rate doctrine does not bar its equitable claims because the FCC allows telecommunication carriers to "recover charges relating to tandem and end office switched access that fall outside those covered by tariffs or negotiated agreements." R. 39 at 12. Peerless cites FCC cases to support its position. *See Qwest Commc'ns Corp. v. Farmers & Merch. Mut. Tel. Co.*, 24 F.C.C. Rcd. 14801, 14813, (rel. Nov. 25, 2009); *In re All Am. Tel. Co. v. AT&T Corp.*, 26 F.C.C. Rcd. 723, 731 (rel. Jan. 20, 2011). However, these FCC decisions were decided prior to the 2013 FCC decision in *All American*, and Peerless has failed to address why *All American* should not apply to this case.

Additionally, Peerless cites district court cases to suggest the filed rate doctrine does not bar claims for services that are not governed by a tariff or negotiated contract. R. 39 at 15 (citing *F.T.C. v. Verity Intern, Ltd.*, 443 F.3d 48, 62

(2d Cir. 2006)). However, the cases Peerless cites, all prior to the 2013 FCC decision in *All American*, are irrelevant to the facts of this case. In *F.T.C. v. Verity Intern, Ltd.*, the plaintiff attempted to recover charges for information services, not telecommunication services. 443 F.3d at 62. In *Brown v. MCI WorldCom Network Servs., Inc.*, the issue was not whether the filed rate doctrine permitted plaintiffs to recover charges outside of a tariff or contract. 277 F.3d 1166, 1171-72 (9th Cir. 2002). The plaintiff in *Brown* merely claimed the defendant wrongly charged him a fee under the defendant's tariff. *Id.* In *Iowa Network Servs., Inc. v. Qwest Corp.*, the court held the filed rate doctrine did not apply to the plaintiff's claim because the telecommunication services at issue were solely intrastate. 466 F.3d 1091, 1095-96 (8th Cir. 2006). The holdings in *Verity Intern*, *Brown*, and *Quest* do not support the argument that telecommunication carriers can recover for access service charges outside of a filed tariff or negotiated contract.

As noted, while *XChange* and *CallerID4u* are not controlling, the Court finds their analyses to be helpful and relevant to the facts at issue. Peerless's equitable claims attempt to recover for access service charges outside of the Switched Access Agreement, Peerless's FCC interstate tariffs, and Peerless's state tariffs. R. 1 ¶¶ 86, 100, 114, 122. The Court finds that the filed rate doctrine bars Peerless from the recovering the equitable relief it seeks—charges outside of a filed tariff or negotiated contract. *XChange*, 2014 WL 4637042, at *6; *CallerID4u*, No. C14-654-TSZ, at 42; *Qwest*, 2012 WL 2995063, at *11; *All American*, 28 F.C.C. Rcd 3477 at 3493-94. Therefore, the Court grants Verizon's motion to dismiss Counts VI-IX. The Court dismisses Counts VI-IX with prejudice.

## IV. Verizon's Motion to Dismiss Counts III-V and XI-XII is Denied as Moot Insofar as Peerless Purports to State a Claim for Violation of the FCA.

Verizon moves to dismiss Counts III-V and XI-XII insofar as the counts purport to state a cause of action under the Federal Communications Act ("FCA"). R. 29 at 12-13. Specifically, Verizon's motion to dismiss refers to Peerless's reliance on 47 U.S.C. § 207 of the FCA as a source of jurisdiction for its action in addition to federal question jurisdiction under 28 U.S.C. § 1331, R. 29. Section 207 of the FCA provides "[a]ny person claiming to be damaged by any common carrier . . . may either make complaint to the [FCC] . . . [or] in any district court of the United States." 47 U.S.C. § 207.

Although Peerless cites 47 U.S.C. § 207 for jurisdictional purposes, it does not rely on 47 U.S.C. § 207 for any of the causes of action in its complaint. R. 1 ¶ 11. Furthermore, Peerless concedes in its response to Verizon's motion to dismiss that it does "not seek any cause of action alleging violation of the [FCA]. Indeed, the sole reference to . . . [§ 207] occurs only with respect to the Court's jurisdiction over carrier collection actions." R. 39 at 14. Most recently, during oral argument on February 12, 2015, Peerless again conceded it is neither asserting a cause of action under the FCA nor seeking to shift attorneys' fees under the FCA. Due to Peerless's repeated concessions, no real controversy exists about whether Peerless is attempting to bring a cause of action under § 207 of the FCA. Therefore, Verizon's motion to dismiss Counts III-V and XI-XII insofar as the counts purport to state a cause of action under the FCA is denied as moot.

## Conclusion

For the foregoing reasons, the Court grants Verizon's motion to dismiss in part and denies the motion in part. The Court denies Verizon's motion to dismiss Counts I-II, in full, and Counts XI-XII, in part, for failure to state a claim for breach of the Switched Access Agreement. The Court grants Verizon's motion to dismiss Count X for failure to state a claim for breach of the Standstill Agreement without prejudice. Should Peerless wish to file an amended complaint repleading Count X, it must do so within 30 days, by June 22, 2015. The Court grants Verizon's motion to dismiss Counts VI-IX with prejudice. Finally, the Court denies Verizon's motion to dismiss Counts III-V and Counts XI-XII, insofar as they purport to state a claim for violation of the FCA, as moot.

ENTERED:

Thomas M. Durkin
United States District Judge

Dated: May 21, 2015