# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PEERLESS NETWORK, INC., *et al.*,　　　　)
　　　　　　　　　　　　　　　　　　)
　　*Plaintiffs-Counterclaim Defendants,*　)
　　　　　　　　　　　　　　　　　　)　　No. 14 C 7417
　　vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Judge Thomas M. Durkin
MCI COMMUNICATIONS SERVICES, INC.,　)
VERIZON SERVICES CORP., and VERIZON　)
SELECT SERVICES, INC.,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　*Defendants-Counterclaim Plaintiffs.*　)


## MEMORANDUM OPINION AND ORDER

This matter presents a billing dispute between two telecommunications

companies. On September 23, 2014, Peerless Network, Inc. and its subsidiaries[1]

---

[1] Peerless's wholly owned subsidiaries include Peerless Network of Arkansas, LLC, Peerless Network of Arizona, LLC, Peerless Network of California, LLC, Peerless Network of Colorado, LLC, Peerless Network of Connecticut, LLC, Peerless Network of Delaware, LLC, Peerless Network of the District of Columbia LLC, Peerless Network of Florida, LLC, Peerless Network of Georgia, LLC, Peerless Network of Illinois, LLC, Peerless Network of Indiana, LLC, Peerless Network of Kansas, LLC, Peerless Network of Kentucky, LLC, Peerless Network of Louisiana, LLC, Peerless Network of Maine, LLC, Peerless Network of Maryland, LLC, Peerless Network of Massachusetts, LLC, Peerless Network of Michigan, LLC, Peerless Network of Minnesota, LLC, Peerless Network of Missouri, LLC, Peerless Network of Nevada, LLC, Peerless Network of New Hampshire, LLC, Peerless Network of New Jersey, LLC, Peerless Network of New York, LLC, Peerless Network of North Carolina, LLC, Peerless Network of Ohio, LLC, Peerless Network of Oklahoma, LLC, Peerless Network of Oregon, LLC, Peerless Network of Pennsylvania, LLC, Peerless Network of Rhode Island, LLC, Peerless Network of South Carolina, LLC, Peerless Network of Tennessee, LLC, Peerless Network of Texas, LLC, Peerless Network of Utah, LLC, Peerless Network of Vermont, LLC, Peerless Network of Virginia, LLC, Peerless Network of Washington, LLC, and Peerless Network of Wisconsin, LLC (collectively, "Peerless").

brought suit to recover amounts allegedly owed by Verizon[2] for telephone exchange traffic that Verizon either delivered to or received from Peerless's network beginning sometime in 2008. Verizon admits it has withheld payment on portions of Peerless's invoices, but denies Peerless is entitled to collect the full amounts billed. Currently before the Court are the parties' cross-motions for partial summary judgment. R. 159; R. 170. For the reasons that follow, both motions are denied in part and granted in part.

## BACKGROUND[3]

### A.  OVERVIEW OF TELEPHONE EXCHANGE SERVICES

As a general matter, telephone exchange services[4] in the United States are divided into two service categories based on the distance of a call: (1) local exchange

---

[2] Defendants include MCI Communications Services, Inc., Verizon Services Corp., and Verizon Select Services Inc. (collectively "Verizon").

[3] The information in this background section comes from a variety of sources, including the allegations of the complaint that are admitted in Verizon's answer or in response to Peerless's Statement of Facts or denied on a basis not proper under the Federal Rules of Civil Procedure and therefore deemed admitted. In addition, the Court considered relevant facts from the parties' Joint Stipulation of Undisputed Facts ("JSOF"), R. 155, and additional facts in the parties' separately filed fact statements that are properly presented and undisputed, which the Court identified after taking into consideration Peerless's two motions to strike, R. 168, 188, and Verizon's responses thereto, R. 180, 191. Finally, large portions of the overview and historical sections are taken directly without further citation from the exhaustive opinions in *CallerID4u, Inc. v. MCI Commc'ns Servs. Inc.*, 2018 WL 493161 (9th Cir. Jan. 22, 2018), and *Great Lakes Commc'ns Corp. v. AT&T Corp.*, 2015 WL 897976 (N.D. Iowa Mar. 3, 2015). For additional history of the FCC's regulation of telephone exchange services, the Court references those decisions.

[4] "The term 'telephone exchange service' means (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of

services, which involve calls that originate (*i.e.,* begin with a calling party) in one exchange service area[5] and terminate (*i.e.,* end to a called party) in the same exchange service area; and (2) interexchange services, which involve calls that originate in one exchange area and terminate in a different exchange area.[6] Interexchange services provide the "middle portion" of calls crossing local exchange area boundaries, and can be either intrastate (*i.e.,* calls that are exchanged within the same state) or interstate (*i.e.,* calls that are exchanged over state boundary lines). In common parlance, local exchange services may be referred to as "local calling" or "local service," and interexchange services may be referred to as "long distance calling" or "long distance service," though these terms are imprecise.

In 1996, Congress adopted the Telecommunications Act of 1996, codified at various provisions in 47 U.S.C. §§ 153 *et seq.* (the "1996 Act"). The 1996 Act requires all telecommunications carriers to interconnect their networks "directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a). Interconnection ensures that consumers can place calls to and receive calls from consumers served by a different telecommunications carrier.[7] Historically, the Federal Communications Commission ("FCC") has exercised

---

switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service." 47 U.S.C. § 153(54).

[5] An exchange service area is a "[g]eographic area in which telephone services and prices are the same." R. 73 at 6 n.1.

[6] *See* 47 U.S.C. § 153(28) (definition of "interstate communication").

[7] *See* 47 U.S.C. § 153(20) ("The term 'exchange access' means the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services.").

jurisdiction over interstate calls, while each individual state's public service commission has exercised jurisdiction over intrastate calls.

To enable carriers to exchange calls between their customers, the FCC has adopted a compensation structure which requires local exchange service companies ("LECs") to allow interstate exchange service companies ("IXCs") to use their telephone lines to originate and terminate interexchange service telephone calls.[8] Thus, when a consumer makes an interexchange call, the consumer's LEC originates the call, performs switching functions and delivers the call (*i.e.*, "hands the call off") to an IXC, and the IXC then hands the call off to the terminating LEC so that the call can be delivered to the called party. A common example of this would be a long-distance call from Chicago to St. Louis. In that example, AT&T Illinois (the incumbent[9] LEC in Chicago) performs transport and switching functions and originates the call on its network, and hands the call over to an IXC, such as Sprint Long-Distance, which carries the call to St. Louis. Sprint then hands the call off to AT&T Missouri (the incumbent LEC in St. Louis), which performs

---

[8] *See* 47 U.S.C. § 259 (requiring the FCC to prescribe regulations that require local exchange carriers "to make available to any qualifying carrier such public switched network infrastructure, technology, information, and telecommunications facilities and functions as may be requested by such qualifying carrier for the purpose of enabling such qualifying carrier to provide telecommunications services, or to provide access to information services, in the service area in which such qualifying carrier has requested and obtained designation as an eligible telecommunications carrier under section 214(e) of this title").

[9] An "incumbent" LEC typically means the Bell operating company that provided local exchange service in a certain area prior to the government break-up of AT&T and its local operating subsidiaries. *See* 47 U.S.C. § 251(h)(1).

switching functions and delivers the call to the called party. While the process sounds cumbersome, in practice it happens in fractions of seconds.

To compensate LECs for use of their networks, IXCs are required to pay "access service charges," also known as "switched exchange access services,"[10] for originating and terminating interexchange telephone calls and for the transport of these calls. These access service charges are set forth either in negotiated agreements between the LECs and IXCs, or in regulated terms of service and price lists—known as tariffs—filed either with a state public service commission for calls originating and terminating within each state, or with the FCC for calls originating and terminating across state lines.

## B.   BRIEF HISTORY OF FCC REGULATION OF TELEPHONE EXCHANGE SERVICES

Until the 1970s, AT&T and its subsidiaries maintained a virtual monopoly over interstate wire telephone services, including both long distance and local wire telephone services. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 220 (1994). AT&T provided long-distance services to consumers, while the Bell

---

[10] *See* 47 C.F.R. § 61.26(a)(3) ("Switched exchange access services shall include: (i) The functional equivalent of the ILEC interstate exchange access services typically associated with the following rate elements: Carrier common line (originating); carrier common line (terminating); local end office switching; interconnection charge; information surcharge; tandem switched transport termination (fixed); tandem switched transport facility (per mile); tandem switching; (ii) The termination of interexchange telecommunications traffic to any end user, either directly or via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service, as defined in 47 U.S.C. 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. 153(36), that does not itself seek to collect reciprocal compensation charges prescribed by this subpart for that traffic, regardless of the specific functions provided or facilities used.").

operating companies, twenty-two local telephone companies wholly owned by AT&T, provided local services to consumers. *See Access Charge Reform Price Cap Order*,[11] 12 FCC Rcd. at 15991. Beginning in the 1970s, new IXCs began entering the long-distance market to compete with AT&T. But because AT&T controlled the Bell operating companies, AT&T could freeze out competition by having its LECs charge higher prices to competing IXCs. *Id*. The federal government challenged these activities in an antitrust lawsuit against AT&T, which resulted in AT&T agreeing to divest itself of all twenty-two Bell operating companies. *Id*. The former Bell LECs are now known as incumbent LECs, or ILECs. *Id*.

After the break-up of AT&T, consumers, specifically the caller and the call recipient, were able to choose their LECs. In doing so, they pay the LECs' charges for local telephone services, but they do not pay the LEC for the switched access services that the LEC provides to the IXC to complete the call. Rather, the IXC must pay those charges. Although the divestiture ended AT&T's anticompetitive control over the ILECs, the ILECs themselves had few competitors, and could use their local monopoly power to charge the IXCs unreasonable and discriminatory switched access rates. To avoid this problem, the FCC began regulating ILEC rates by requiring ILECs to file and maintain tariffs with the FCC for interstate switched access services.

---

[11] *In the Matter of Access Charge Reform Price Cap Performance Review for Local Exch. Carriers Transp. Rate Structure & Pricing End User Common Line Charges*, 12 F.C.C. Rcd. 15982 (1997).

After years of experimenting with permissive detariffing of both ILECs and CLECs[12], the FCC determined that some CLECs were taking advantage of the system by filing tariffs setting unreasonably high switched access rates that were "subject neither to negotiation nor to regulation designed to ensure their reasonableness." *In re Access Charge Reform*, 16 F.C.C. Rcd. 9923 at ¶ 2 (2001). As it turned out, CLECs, like ILECs, were generally "insulated from the effects of competition," because the caller and call recipient who choose their LECs (but do not pay for terminating switched access services) have "no incentive to select an [LEC] with low rates." *Id*. at ¶ 28. Under this framework, the IXCs had to pay whatever rate was set by the CLECs in their tariffs in order to provide phone service to their customers, because the customers that actually choose the terminating CLEC do not also pay their access charges and have no incentive to select CLECs with low rates. *Id*. The CLECs therefore could impose rates far higher than the ILECs (whose rates were regulated), with no risk that those high rates would drive away the CLECs' individual customers. *See Developing a Unified Intercarrier Comp. Regime*, 16 FCC Rcd. 9610 at ¶ 133 (2001).

In response to this regulatory arbitrage opportunity, the FCC issued the *Access Reform Order* in 2001, revising its CLEC tariffing system and conducting a new forbearance analysis. *In re Access Charge Reform*, 16 F.C.C. Rcd. 9923 (2001). In this order, the FCC first established a "benchmark" level for CLEC rates based

---

[12] A CLEC is a "local exchange carrier that provides some or all of the interstate exchange access services used to send traffic to or from an end user and does not fall within the definition of 'incumbent local exchange carrier.'" 47 C.F.R. § 61.26(a)(1).

on the rates charged by the ILEC or ILECs operating in a CLEC's service area. *In re Access Charge Reform*, 16 F.C.C. Rcd. at 9941. A CLECs' tariffed rates would be "presumed to be just and reasonable" as long as they did not exceed the benchmark rate. *Id.* at 9938. Second, the FCC revised its decision in the *Hyperion Order*;[13] rather than give CLECs free rein to choose whether to file tariffs, the FCC decided to exercise its forbearance authority "only for those CLEC interstate access services for which the aggregate charges exceed our benchmark" by requiring CLECs that sought to charge rates above the benchmark to negotiate agreements with IXCs. *In re Access Charge Reform*, 16 F.C.C. Rcd. at 9957.

As a result of the *Access Reform Order*,

> [t]here are two means by which a CLEC can provide an IXC with, and charge for, interstate access services. First, a CLEC may tariff interstate access charges if its rates are no higher than the rates charged for such services by the competing ILEC (the benchmark rule). If a CLEC provides only a "portion of the switched exchange access services used to send traffic to or from an end user not served by that CLEC," its rate must "not exceed the rate charged by the competing ILEC for the same access services." [14] . . . Second, as an alternative to tariffing, a CLEC may negotiate and enter into an agreement with an

---

[13] *Hyperion Telecomms., Inc. Petition Requesting Forbearance*, 12 FCC Rcd. 8596 (1997).

[14] *See* 47 C.F.R. § 61.26(c) ("The benchmark rate for a CLEC's switched exchange access services will be the rate charged for similar services by the competing ILEC. If an ILEC to which a CLEC benchmarks its rates, pursuant to this section, lowers the rate to which a CLEC benchmarks, the CLEC must revise its rates to the lower level within 15 days of the effective date of the lowered ILEC rate."). The FCC exempted "a narrow class of rural CLECs from its benchmark rule, . . . permitting qualifying carriers to file tariffs containing rates "at the level of those in the NECA [National Exchange Carrier Association] access tariff." *In re AT&T Servs. Inc.*, 30 F.C.C. Rcd. at 2588.

IXC to charge rates higher than those permitted under
the benchmark rule.

*In re AT&T Servs. Inc.*, 30 F.C.C. Rcd. 2586, 258–889 (2015), *review denied in part,*

*cause remanded by Great Lakes Comnet, Inc. v. Fed. Commc'ns Comm'n*, 823 F.3d

998 (D.C. Cir. 2016).

## C.    THE PRESENT CASE

With two exceptions, the Peerless subsidiaries are CLECs,[15] while Verizon is

an IXC that provides telephone services nationwide.[16] *See* R. 155, JSOF, ¶¶ 3, 4.

Peerless seeks compensation for unpaid access charge rate elements and related

services beginning in 2008. Specifically, Peerless seeks payment of billed charges for

switched access services, both originating and terminating, provided to Verizon at

an "end office" and at a "tandem."[17] *Id.,* JSOF, ¶ 7.

---

[15] The parent company, Peerless Network, Inc., is not itself a CLEC. *See* R. 155, JSOF, ¶ 2. The two exceptions among Peerless's subsidiaries that apparently are not CLECs are Peerless Network of Louisiana, LLC (which is a certified Competitive Access Provider) and Peerless Network of Maine, LLC. *Id.* at ¶ 3. Although the parties discuss and dispute the relevance of the fact that Peerless Network, Inc. is not a CLEC, neither have made any argument concerning the relevance, if any, of the fact that two subsidiaries are not CLECs. Further, the Court notes that Peerless "admitted" in its answer that "each of [Peerless's] subsidiaries is certified by the relevant state public utility commission as a competitive local exchange carrier." R. 77, Peerless Answer, ¶ 6.

[16] More specifically, MCI Communications Services, Inc. provides long distance services as an IXC, while Verizon Select Services, Inc. is a telecommunications carrier that provides long-distance telephone services and Verizon Services Corporation is a management company that provides centralized administrative services to Verizon companies. R. 155, JSOF, ¶ 4.

[17] Generally, tandem charges are incurred for connecting and routing telephone traffic between end office switches, *see, e.g. AT&T Corp. v. Beehive Tel. Co.*, 2010 U.S. Dist. LEXIS 5804, *6 (D. Ut. Jan. 26, 2010), and end office charges are incurred for the functions of processing and exchanging calls to subscribers, *In the*

### 1.    2008-2014 BILLING DISPUTES

Originally, Peerless billed Verizon access service charges pursuant to its tariffed rates. But in 2009, Peerless made a sales pitch to Verizon that Peerless would beat the tandem switching rates offered by AT&T, the company from which Verizon had been purchasing those services. R. 236-2, Resp. to Verizon Statement of Facts ("VSOF"), ¶ 2 (admitted). To this end, in February 2009, Verizon and Peerless entered into the Tandem Service Agreement under which Peerless agreed to provide Verizon tandem switching services at rates that were lower than Peerless's tariffed rates. *Id.,* Resp. to VSOF, ¶ 4 (admitted). In addition, Peerless agreed to amend the contractual rates "such that the rates remain lower than the prevailing ILEC level in the event ILEC rates are lowered." *Id.*, Resp. to VSOF, ¶ 3.

In 2013, "the relationship between Peerless and Verizon broke down because Verizon disputed its bills from Peerless for switched access charges and Peerless alleged Verizon wrongfully disputed its billings." *See* R. 69 at 4 (*Peerless Network, Inc. v. MCI Commc'n Servs., Inc.*, 2015 WL 2455128, at *2 (N.D. Ill. May 21, 2015)). Verizon internally decided that Peerless was engaged in a practice Verizon calls "traffic pumping,"[18] which artificially inflated Peerless's access charges. As a result, Verizon began withholding full payment for Peerless's services. According to Peerless, Verizon "implemented a plan to withhold full payment . . . all while not challenging Peerless's rates with the FCC or state commissions," and, beginning in

---

*Matter of Connect America Fund*, 30 FCC Rcd 1587, 600-1603 ¶¶ 26–31 (rel. Feb. 11, 2015) ("Declaratory Ruling").

[18] Verizon refers to the practice as "traffic pumping," but the Court will use the FCC's term of "access stimulation."

2014, "stopped paying for Peerless's switched access services altogether." R. 236-1, Peerless Statement of Facts ("PSOF"), ¶¶ 17–18 (citations omitted). Verizon, on the other hand, asserts that it stopped paying Peerless's tariffed charges after determining, *inter alia*, that Peerless was billing for services it was not providing and was engaging in access stimulation without complying with the FCC's access stimulation rules. R. 162-1, VSOF, ¶ 10. Further, Verizon rejects any contention that it has failed to pay "all" end office and tandem charges, stating that, since January 2012, it has paid Peerless more than $24.9 million in switched access charges (not counting Verizon's additional payments to Peerless for other types of telecommunications services not at issue in this litigation).

On September 18, 2013, in an effort to postpone litigation, Peerless and Verizon entered into a Standstill Agreement. *See* R. 155, JSOF, ¶ 62. Section 2(b) of that Agreement provides that:

> Peerless may continue to bill Verizon for certain intercarrier compensation charges that it contends in good faith apply to services rendered by Peerless to Verizon (the "Peerless New Charges,"), and Verizon shall pay any such charges that are not subject to a good faith dispute, but Verizon may dispute and withhold payment of any such charges as to which Verizon brings a good faith dispute. Verizon shall state with specificity the basis of any good faith dispute (*e.g.* that the charges do not apply given the nature of the jurisdiction, that the call detail records do not support the charge or that the charges are inconsistent with law).

R. 236-2, Resp. to VSOF, ¶ 7 (admitted).

While the Standstill Agreement may have postponed litigation, it did not resolve the parties' disagreements. Apparently in response to Verizon's continued

withholding of payment on billed charges, Peerless notified Verizon in July 2014 that, "effective immediately," it was replacing the contractual tandem switched access rates with its higher tariff rates.[19] The federal tariffs at issue include Peerless's FCC Tariff No. 3, in effect from May 2011 to September 2013, and FCC Tariff No. 4, initially filed with the FCC on September 13, 2013, with an effective date of September 28, 2013, and amended in July 2014, July 2015, November 2015, and July 2016 (collectively hereinafter "the Tariff").[20] After Peerless cancelled the lower rates in the Tandem Services Agreement, Peerless asserts that Verizon's payments to it dropped even further, with Verizon withholding additional amounts on even undisputed charges as a way of recouping previous charges paid by Verizon but which Verizon now sought to dispute. As of the summary judgment filings, Peerless alleges that Verizon owed it $256,563.44 under the Tandem Services Agreement, and $34,301,674.49 in combined federal and state tariffs. R.236-1, PSOF, ¶¶ 26, 30.

### 2. THIS LAWSUIT

Not surprisingly, the history of this litigation has been marked by as much confrontation and brinksmanship as the parties' relationship outside this litigation. Peerless filed the original complaint over three years ago on September 23, 2014, alleging twelve causes of action arising out of Verizon's withholding of payments on Peerless's invoices. R. 1, Compl. Shortly thereafter, Peerless filed a motion to stay

---

[19] R. 236-2, Resp. to VSOF, ¶¶ 5–6 ("Peerless did not cancel the Tandem Service Agreement; it terminated the contract rates which then defaulted the tandem rates under the agreement to the tariff."); R. 178-1, Resp. to PSOF, ¶¶ 24–25.

[20] *See* R. 178-1, Resp. to PSOF, ¶¶ 32–33, 36; *see also* R. 155, JSOF, ¶¶ 11–12.

one count in the complaint, which dealt with Peerless's originating end office switched access service charges for calls destined to Verizon's customers that subscribe to Verizon's 8YY services.[21] Peerless sought to stay that count because it concerned access charges where VoIP (voice-over-internet-protocol) technology is used to place the call, and issues related to VoIP technology were then pending before the FCC. R. 32. Not long afterwards, the FCC ruled in favor of Peerless's position on the VoIP/8YY issue in the *Declaratory Ruling*,[22] and, as a result, on February 12, 2015, Peerless withdrew its motion to stay. In 2016, however, the FCC's order was vacated by the D.C. Circuit Court of Appeals, affecting issues related to the parties' summary judgment briefings. *AT&T Corp. v. Fed. Commc'ns Comm'n*, 841 F.3d 1047 (D.C. Cir. 2016).

Verizon responded to the complaint by filing a partial motion to dismiss. After the Court granted in part and denied in part Verizon's partial motion to dismiss, R. 69, Peerless filed the operative amended complaint. *See* R. 73; *see also* R. 76, Supp. to Am. Complaint. The amended complaint asserts the following eight claims against Verizon:

> Count I—Breach of the Tandem Services Agreement with respect to interstate access services;
>
> Count II—Breach of the Tandem Services Agreement with respect to intrastate access services;

---

[21] "8YY" calls are toll-free 1-800 calls. R. 73, Am. Compl., ¶ 1; s*ee also Teliax, Inc. v. AT&T Corp.,* 2017 WL 3839459, at *1 (D. Colo. Sept. 1, 2017).

[22] *In re Connect America Fund*, 30 FCC Rcd. 1587 (2015) (hereinafter "Declaratory Ruling").

Count III—Collection action pursuant to Peerless's federal tariffs;

Count IV—Collection action pursuant to Peerless's federal tariffs for 8YY calls;

Count V—Collection action pursuant to Peerless's state tariffs;

[Counts VI through IX were dismissed with prejudice pursuant to the Court's May 21, 2015 Order]

Count X—Breach of the parties' Standstill Agreement;

Count XI—Declaratory relief with respect to interstate switched access services; and

Count XII—Declaratory relief with respect to intrastate switched access services.

In response to the amended complaint, Verizon alleged Peerless's claims were barred in whole or in part by four affirmative defenses: (1) the filed rate doctrine; (2) the applicable statute of limitations; (3) the doctrines of laches, estoppel, and unclean hands; and (4) the doctrine of recoupment. R. 75 at 28. Verizon also alleged the following counterclaims by which it sought to recover charges previously paid by it:

Counterclaim One: Breach of Federal Tariff;

Counterclaim Two: Breach of State Tariffs;

Counterclaim Three: Declaratory Judgment—Breach of Federal Tariff; and

Counterclaim Four: Declaratory Judgment—Breach of State Tariffs.

R. 75 at 34–36.

On July 31, 2015, Peerless filed a new federal tariff. Even though Peerless maintained that it was not and never had been engaged in access stimulation, as Verizon asserted, Peerless claimed that its newly filed tariff met the requirements for access charges stemming from access stimulation activities, and thus that Verizon had no good faith basis for continuing to withhold payments under the new tariff. Based on this premise, and in an effort to put a stop to Verizon's withholding of payments on at least some of Peerless's switched access charges, on December 15, 2015, Peerless filed a motion for preliminary injunction. *See* R. 96. Peerless's motion sought to require Verizon to pay certain categories of switched access charges going forward based on the new Tariff, which Peerless contended satisfied even Verizon's view of what those charges should be.

An injunction hearing was held beginning on February 11, 2016, *see* R. 118. The Court heard two full days of testimony and received hundreds of pages of documents into evidence. At the end of the second day, the Court questioned Verizon on why it was disputing Peerless's interpretation of certain FCC orders when it appeared from the testimony presented at the hearing that, if Peerless had used Verizon's interpretation instead, it would have charged Verizon more, not less, than what Peerless in fact charged. *See* R. 127, Prel. Inj. Hrg. Tr., Feb. 12, 2016, 259:23–260:1 (Court: "I hope we're not fighting about [Peerless] being wrong, but the result of their error resulted in lower charges to [Verizon], and [Verizon is] not

paying [simply] because [Peerless] is wrong, because that is senseless.").[23] It was unclear at the time whether Verizon conceded that was the case,[24] and the injunction hearing was continued without resolution of that question. At the continued hearing date, the parties informed the Court that an agreement had been reached to resolve Peerless's preliminary injunction motion.

On August 10, 2016, Verizon filed its motion for partial summary judgment, R. 159. On August 31, 2016, Peerless filed its cross-motion for partial summary judgment and combined response in opposition to Verizon's motion for partial summary judgment. R. 170.[25] The parties filed supplemental briefs after the D.C. Circuit vacated the *Declaratory Ruling*[26] (R. 207 and R. 208) and various supplemental authority discussing cases decided by other courts on issues relevant here. *See* R. 199, 222, 228, 238.

---

[23] *See* R. 172-7, Decl. of Patrick Phipps, at 2 ("[F]ollowing Peerless's July 2015 tariff filing (which modified Peerless's interstate switched access rates to mirror those of the LPCL in each state), Peerless billed the relevant Verizon defendant interexchange carriers ("IXCs") less for interstate switched access services than Peerless would have billed to those same Verizon IXCs if Peerless would have mirrored the interstate switched access rates of the price cap local exchange carriers who Verizon claims are the lowest price cap LECs").

[24] Verizon appears to take the position that the issue is not before the Court because "Peerless did not further amend its amended complaint to include charges billed under the new tariff, nor was the new tariff a significant subject of discovery between the parties." R. 162 at 10.

[25] Peerless later filed an Amended Memorandum of Law in Support of Its Motion for Partial Summary Judgment, R. 236, which the Court cites throughout this opinion.

[26] *In the Matter of Connect Am. Fund*, 30 F.C.C. Rcd. 1587 (2015) (hereinafter "Declaratory Ruling").

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Peerless alleges that Verizon's refusal to comply with the terms of the Tandem Services Agreement and Peerless's federal and state tariffs is unlawful and on-going, that Verizon refuses to pay for access services despite continuing to receive those services from Peerless, and that Peerless has an obligation under the law to prevent telephone users' service disruptions by continuing to provide those services to Verizon even though Verizon refuses to pay Peerless's charges for them. It is undisputed that Verizon delivered the traffic at issue to Peerless's network, that, in return, Peerless delivered switched access and related services to Verizon,

and that Peerless invoiced Verizon for those services. It also is undisputed that Verizon has withheld payment on disputed portions of those invoices, as well as set off against undisputed portions previously paid amounts that Verizon did not dispute when it paid them but now wants to dispute. *See* R. 178-1, Resp. to PSOF, ¶ 49 (admitting that Verizon deducted amounts from current bills to recoup previous amounts that Peerless unlawfully collected from Verizon).

Peerless moves for summary judgment on its claims to collect under the Tandem Services Agreement and its federal and state tariffs, and seeks a declaration as to its right to recover under those tariffs. Verizon, on the other hand, moves for summary judgment on Peerless's collection and declaratory judgment claims, as well as on Verizon's counterclaims seeking to recover amounts Peerless already has collected and retained pursuant to its tariffs. According to Verizon, Peerless is not entitled to recover under its tariffs for three reasons. First, Verizon argues Peerless's tariffs are unlawful because they fail to comply with the FCC's regulations concerning "access stimulation." This is also the basis of Verizon's counterclaims. Second, Verizon argues Peerless has billed its tariffed end office switched access rate for calls that it routes over the public Internet, but routing such calls is not end office switching. Third, some of Peerless's customers offer international calling card services, which require a pre-paid calling card and the dialing of a number to reach the international destination. Verizon argues that because the calls terminate internationally, Peerless cannot charge for terminating switched access services it provides for these calls.

The Court will first address Verizon's arguments against Peerless's collection actions and then proceed to the remaining issues. Virtually all of the summary judgment briefing focuses on Verizon's access stimulation arguments, and therefore the Court will do the same here. The parties will be permitted to file a supplemental statement regarding the state tariffs following the entry of this order.[27]

## I.  VERIZON'S ACCESS STIMULATION ARGUMENT

Verizon argues that Peerless cannot collect on its Tariff because it violates FCC regulations governing a practice known as access stimulation. According to the FCC:

> Access stimulation occurs when a LEC with high switched access rates enters into an arrangement with a provider of high call volume operations such as chat lines, adult entertainment calls, and "free" conference calls. The arrangement inflates or stimulates the access minutes terminated to the LEC, and the LEC then shares a portion of the increased access revenues resulting from the increased demand with the "free" service provider, or offers some other benefit to the "free" service provider. The shared revenues received by the service provider cover its costs, and it therefore may not need to, and typically does not, assess a separate charge for the service

---

[27] Verizon argues that Peerless's state tariffs are invalid based on its federal access stimulation arguments. R. 178 at 4 n. 5. However, the FCC explained that states retain regulatory authority over state tariff regulations. *In the Matter of Connect Am. Fund A Nat'l Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Comp. Regime Fed.-State Joint Bd. on Universal Serv. Lifeline & Link-Up Universal Serv. Reform -- Mobility Fund*, 26 F.C.C. Rcd. 17663 ¶ 790 (2011) ("States…will continue to oversee the tariffing of intrastate rate reductions during the transition period"); *see also In re Qwest Commc'ns Corp.,* dkt. FCU-2007-0002, Order Initiating Refund Proceedings and Requesting Responses, 2013 WL 3778429 (Ia. Util. Bd. Jul. 16, 2013) (examining access stimulation under its own complaint procedures). Further, Verizon has not raised any state-specific access stimulation claims.

> it is offering. Meanwhile, the wireless and . . . IXCs[ ]
> paying the increased access charges are forced to recover
> these costs from all their customers, even though many of
> those customers do not use the services stimulating the
> access demand.

*Connect America Fund*, 26 F.C.C. Rcd. 17663, ¶ 656.[28]

Because access stimulation can lead to inflated profits for the LEC, *id.,* ¶ 657,

in 2011 the FCC sought to limit and regulate the practice with a second benchmark

rule. Under the access stimulation benchmark, an LEC engaging in access

stimulation must "reduce its interstate switched access tariffed rates to the rates of

the price cap LEC in the state with the lowest rates." *Id*. This rule is codified in 47

C.F.R. § 61.26(g), which provides that:

> (1) A CLEC engaging in access stimulation, as that term
> is defined in § 61.3(bbb), shall not file a tariff for its
> interstate exchange access services that prices those
> services above the rate prescribed in the access tariff of
> the price cap LEC with the lowest switched access rates in
> the state.

> (2) A CLEC engaging in access stimulation, as that term
> is defined in § 61.3(bbb), shall file revised interstate
> switched access tariffs within forty-five (45) days of
> commencing access stimulation, as that term is defined in
> § 61.3(bbb), or within forty-five (45) days of [date] if the
> CLEC on that date is engaged in access stimulation, as
> that term is defined in § 61.3(bbb).

---

[28] *In the Matter of Connect Am. Fund A Nat'l Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Comp. Regime Fed.-State Joint Bd. on Universal Serv. Lifeline & Link-Up Universal Serv. Reform—Mobility Fund,* 26 F.C.C. Rcd. 17663 (2011) (hereinafter "*Connect America Fund*").

47 C.F.R. § 61.26(g). Verizon argues that the undisputed facts show Peerless has been engaged in access stimulation since January 2012, but did not file tariffs that comply with § 61.26(g) until July 2015.

To decide whether Peerless has in fact been engaged in access stimulation, the Court must consult the FCC regulations. Those regulations provide that an LEC engages in access stimulation if it has entered into an "access revenue sharing agreement," which is defined at 47 C.F.R. § 61.3(bbb)(1)(i). In addition, for a CLEC to be considered an access stimulator, it must meet one of two possible tests: either (a) it has "an interstate terminating-to-originating traffic ratio of at least 3:1 in a calendar month,"; or (b) it has "more than a 100 percent growth in interstate originating and/or terminating switched access minutes of use in a month compared to the same month in the preceding year." *Id.,* § 61.3(bbb)(1)(ii).

The Court finds that Verizon is not entitled to summary judgment on its access stimulation argument because that issue depends on the resolution of numerous interpretative questions concerning, among others, the FCC's definition of an "access revenue sharing agreement," and the proper methodology for identifying the benchmark rate of the "price cap LEC with the lowest switched access rates in the state." *See* 47 C.F.R. §61.26(g)(1); *see also* R. 162 at 17–18; R. 236 at 10, 12. The parties present dueling evidence on these issues.[29] It is clear from the

---

[29] *See, e.g.,* R. 162-1, VSOF, ¶ 45 ("The lowest price cap incumbent LEC in each state, as calculated based on the tariffed terminating end office switching rate elements, is set forth in the Traffic Pumping Rate Determination that Verizon provided to Peerless during discovery."); R. 236-2, Resp. to VSOF, ¶ 45 ("DENIED. The methodology used by Verizon to create that list is not the proper methodology

record that guidance is needed from the agency that devised the access stimulation rule as to how to interpret and apply that rule. Verizon recognizes as much when it argues that, in the alternative to resolving the issues raised in its summary judgment motion, the Court should refer those issues to the FCC under the primary jurisdiction doctrine. *See* R. 178 at 30–31.

Primary jurisdiction is a permissive doctrine that applies when resolving a claim requires administrative expertise. *See United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Invests., LLC*, 828 F.3d 587, 592 (7th Cir. 2016); *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996) ("courts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency"). "In such cases, a federal court may stay the proceeding to allow the agency to take the first look at the case." *Horning Invests,* 828 F.3d at 592. Rulings on whether Peerless has been engaged in access stimulation, and, if so, whether its Tariff does not exceed the benchmark, which in turn raises issues of methodology for identifying the benchmark rate of the price cap LEC with the lowest switched access rates in the state, are within the FCC's primary jurisdiction. *Pennington v. Zionsolutions LLC,* 742 F.3d 715, 719–20 (7th Cir. 2014) ("'Primary jurisdiction' . . . applies where a claim is originally cognizable in the courts, and comes into play

_____

to make that determination as it does not take into account Peerless's mix of traffic….Verizon's methodology fails to account these differences in the quantity of minutes."); *Id.*, ¶ 46 (citing to expert testimony to dispute methodology used by Verizon in determining whether Peerless's tariffs were required to benchmark to the lowest price cap incumbent LEC).

whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.") (quoting *United States v. Western Pacific R.R.*, 352 U.S. 59, 63–64 (1956)).

"That description of the doctrine fits this case to a T." *Id.* at 720. The FCC first set forth the access stimulation rules in *Connect America Fund*. Here, Peerless contends that it complied with the rules established by the FCC by filing the Tariff, while Verizon claims that Peerless's Tariff rates are too high. The parties disagree on several key definitional issues, which determine how to calculate the appropriate access stimulator benchmark rate, as well as how to determine whether a CLEC is an access stimulator required to set its prices at or below that benchmark. *Connect America Fund* does not speak specifically to those definitional issues. In short, the interests of agency expertise, consistency, and uniformity compel a finding that the FCC has primary jurisdiction over Verizon's claims that (1) Peerless is or was engaged in access stimulation, and (2) if Peerless was so engaged, that its switched access rates are or were not properly benchmarked as required by *Connect America Fund. See, e.g., Teliax, Inc. v. AT&T Corp.*, 2017 WL 3839459, at *2-3 (D. Colo. Sept. 1, 2017) (transferring case to FCC under the doctrine of primary jurisdiction because "[a]lthough it perhaps goes without saying, judges with no technical background in telecommunications are ill-prepared when compared to the FCC to decide [certain technical issues]"); *Great Lakes Commun'c Corp. v. AT&T Corp.*,

2014 WL 2866474, at *14 (N.D. Iowa June 24, 2014) (Report and Recommendation) (holding that AT&T's claims that the CLEC's interstate switched access rates were so high as to be unjust and unreasonable, "present[ ] a textbook scenario for invoking primary jurisdiction"), *aff'd,* 2015 WL 897976, *6 (N.D. Iowa Mar. 3, 2015).

## II. VERIZON'S VoIP ARGUMENT

Verizon's second argument against Peerless's Tariff collection action is that Peerless cannot collect on its tariffs involving Voice-over-Internet-Protocol ("VoIP"). Specifically, Verizon argued that Peerless cannot collect charges on calls provided with a VoIP partner unless Peerless assigned the telephone to the calling party. Following summary judgment briefing, however, the D.C. Circuit vacated and remanded a FCC ruling. As explained in more detail below, the vacatur of the ruling allowed Verizon to also argue that CLECs like Peerless cannot charge for terminating switched access charges at all when partnering with a VoIP provider.

"VoIP is a newer technology that delivers telephone calls by splitting data into tiny packets traveling the most efficient pathways available, rather than the traditional format, which transmits data over a single pathway." *CenturyTel of Chatham, LLC v. Sprint Commc'ns Co.,* 861 F.3d 566, 568–69 (5th Cir. 2017). "There are two types of VoIP providers—"facilities based" providers, which typically provide the last-mile facility that connects the end user to the end office switch (*e.g.* Comcast), and "over the top" (OTT) providers that do not provide the last-mile facility to the end user (*e.g.* Vonage). R. 172 at 34-35. According to Verizon, the FCC has a "long-standing policy" under which a LEC "should charge only for those services that they provide." R. 162 at 22.

But, starting with the *Connect America Fund*, the FCC departed from this "long-standing" principle by clarifying carrier compensation requirements for newer VoIP technology:

> When multiple providers [i.e., a wholesale LEC or its retail VoIP partner] jointly provided access, the Commission was concerned that, for example, permitting a single competitive LEC to impose via tariff all the same charges as an incumbent LEC, regardless of the functions that competitive LEC performs, could result in double billing. In light of the policy considerations implicated here, we adopt a different approach to address concerns about double billing. As discussed above, we believe that a symmetrical approach to VoIP-PSTN intercarrier compensation is the best policy, and thus believe that competitive LECs should be entitled to charge the same intercarrier compensation as incumbent LECs do under comparable circumstances.

26 F.C.C. Rcd. 17663, ¶ 970. The FCC codified this principle in what is now known as the "VoIP symmetry rule." The VoIP symmetry rule states that an LEC can assess and collect full access charges, "regardless of whether the local exchange carrier itself delivers such traffic to the called party's premises or delivers the call to the called party's premises via contractual or other arrangements with an affiliated or unaffiliated provider of interconnection VoIP service, as defined in 47 U.S.C. 153(25), or a non-interconnected VoIP service, as defined in 47 U.S.C. 153(36)." 47 C.F.R. 51.913(b).

The rule has limitations. For example, an LEC cannot "charge for functions not performed by the local exchange carrier itself or the affiliated or unaffiliated provider of interconnected VoIP service or non-interconnected VoIP service." *Id*. In addition, the FCC amended 47 C.F.R. § 61.26(f), which is the tariffing provision

intended to implement the VoIP symmetry rule, to allow CLECs to assess rates for access services based on the portion of the service provided. Those services include end office access services provided as the "functional equivalent of the incumbent local exchange carrier access service provided by a non-incumbent local exchange carrier." 47 C.F.R. § 51.903(d)(3). In *Connect America Fund*, the FCC recognized that LECs partnered with VoIP providers to supply end office access services. It specified that a LEC could collect for access services "regardless of whether the [LEC] itself delivers such traffic to the called party's premises or delivers the call ... via contractual or other arrangements with an affiliated or unaffiliated provider of interconnected VoIP service."[30] In short, *Connect America Fund* allowed a VoIP provider and its LEC partner (collectively, "VoIP-LEC") to charge for providing the "functional equivalent" of end-office switching services. In the *Declaratory Ruling*, the FCC upheld *Connect America Fund*, ruling that such services are end-office access under subsection (3) of § 51.903(d). *Declaratory Ruling* at 1588–89, ¶ 3.

AT&T challenged the *Declaratory Ruling*. The D.C. Circuit held that the FCC had not explained what the phrase "functionally equivalent" meant "with the requisite clarity to enable [the court] to sustain [the] conclusion" that the services that LECs like Peerless provide are the "functional equivalent" of end-office switching. *AT&T Corp. v. FCC*, 841 F.3d 1047, 1049 (D.C. Cir.

---

[30] *In the Matter of Connect Am. Fund A Nat'l Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Comp. Regime Fed.-State Joint Bd. on Universal Serv. Lifeline & Link-Up Universal Serv. Reform -- Mobility Fund*, 26 F.C.C. Rcd. 17663 at 388 (2011).

2016) (vacating *Declaratory Ruling*, 30 FCC Rcd. 1587 (2015)) ("AT&T Order"). The D.C. Circuit vacated the *Declaratory Ruling* and remanded to the FCC the issue of what services, if any, provided by over-the-top VoIP–LEC providers constitute the "functional equivalent" of end-office switching.

Both parties submitted supplemental briefs on the effect of the AT&T Order. R. 207, 208. Verizon argues that the AT&T Order brings into question whether Peerless and its VoIP partner perform the functional equivalent of end-office switching, meaning Peerless could not charge for those services under its tariff pursuant to the VoIP Symmetry Rule. R. 207. Peerless argues the AT&T Order had very little effect on the VoIP Symmetry Rule. Peerless says the AT&T Order merely vacated the *Declaratory Ruling* that interpreted the rule, without affecting the rule itself.

Like the access stimulation issues, the Court finds it appropriate to refer the VoIP issue to the FCC. The *Teliax* court referred an identical issue to the FCC because, "[a]lthough it perhaps goes without saying, judges with no technical background in telecommunications are ill-prepared when compared to the FCC to decide what services if any performed by over-the-top VoIP-LEC providers constitute the 'functional equivalent' of the end-office switching. Furthermore, it is quite clear that the FCC desires uniformity with respect to this issue as its previous attempt to do so through the *[Declaratory Ruling]* evidences." *See, e.g., Teliax, Inc. v. AT&T Corp.*, 2017 WL 3839459, at *2-3 (D. Colo. Sept. 1, 2017). Peerless argues against referral because of the procedural posture of this case—specifically that the

case has been pending for a number of years and that referral to the FCC will further delay payment on its long overdue collection action.[31] But the Court finds referral appropriate in light of the *Teliax* court's recent referral, the technical nature of these issues, and the need to ensure uniformity. And, in light of the Court's decision later in this opinion granting Peerless's collection action, the Court finds that Peerless will not be prejudiced by referral to the FCC.

Because the *Declaratory Ruling* was in effect during the parties' initial briefing, Verizon did not make an argument regarding this issue on summary judgment. Verizon instead argued for summary judgment on the basis that Peerless cannot collect its tariffed end office originating switched access charges for calls customers of Peerless's VoIP partners dialed where a competitive LEC other than Peerless assigned the telephone number to the person placing the call.[32] To the

---

[31] In supplemental briefings, Verizon argued that the Court could decide the issue based on a recent order in *O1 Communications, Inc. v. AT&T Corp.,* No. 16-cv-01452, Dkt. 106 (N.D. Ca. Dec. 19, 2017). The court there held that when a CLEC like Peerless routes over-the-top Voice-over-Internet Protocol ("VoIP") traffic, the services that a telephone company provides are "not end office access services" or a "functional equivalent of those services." *Id.* at 2. Instead of following the *Teliax* court's approach of referring the matter to the FCC, the *O1* court decided that VoIP calls are not the functional equivalent of end office access services, relying on *AT&T Corp. v. FCC*, 841 F.3d 1047 (D.C. Cir. 2016). The Court finds that the AT&T Order did not go so far to find that VoIP traffic is not the functional equivalent of end office access services. Rather, it merely held that the FCC had not sufficiently explained what constitutes the functional equivalent of end office access services. This issue is proper for the FCC to decide, not a court lacking the appropriate technical knowledge.

[32] The Court is skeptical of Verizon's arguments on this issue. 47 C.F.R. § 61.26(f) appears to pose two alternatives to collection of switched access charges: (1) calls where the CLEC provides service to the end user where the CLEC may assess a rate not to "exceed the rate charged by the competing ILEC for the same access services provided" as long as the CLEC "provides some portion of the switched

extent Verizon intends on pursuing this alternative argument, the Court refers that issue to the FCC as well.

## III. VERIZON'S 8YY ARGUMENT

Verizon's final claim against Peerless's Tariff collection action is that Peerless cannot collect its tariffed end office terminating switched access charges for calls that it delivers to a two-stage dialing platform—such as those used to place international calls with a prepaid calling card—because Peerless does not terminate those calls.

The FCC has described two-stage calls as follows:

> A calling card customer typically dials a number to reach the service provider's centralized switching platform and the platform requests the unique personal identification number associated with the card for purposes of verification and billing. When prompted by the platform, the customer dials the destination number and the platform routes the call to the intended recipient.

---

exchange access services used to send traffic to or from an end user," and (2) calls where the CLEC is the assigning carrier in the NPAC database, for which the CLEC may assess "a rate equal to the rate that would be charged by the competing ILEC for all exchange access services required to deliver interstate traffic to the called number." 47 C.F.R. § 61.26(f). Verizon argues that Peerless can collect only for the second category. But 47 C.F.R. § 61.26(f) does not require Peerless to be the assigning carrier in the NPAC database to charge for the services it provides. It only requires Peerless be the assigning carrier to charge the rate charged "for all exchange access services." Nor does the Court agree with Verizon's argument that because "Peerless *alone* does not provide end office switching," it is not entitled to charge the tariffed rates for over-the-top VoIP calls provided by it and its VoIP partners. R. 178 at 21. Verizon provides no support for this assertion. Indeed, the VoIP Symmetry Rule explicitly allows Peerless to charge a rate that does not exceed the rate charged by the ILEC for "access services provided" by "contractual or other arrangements with an affiliated or unaffiliated provider of interconnection VoIP service." 47 C.F.R. 51.913(b). However, because the AT&T Order questioned whether CLECs like Peerless can collect under the VoIP Symmetry Rule at all, the Court finds referral appropriate.

Order and Notice of Proposed Rulemaking, *AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Servs.*, 20 FCC Rcd 4826, ¶ 3 (2005). Relying on *Broadvox-CLEC, LLC v. AT&T Corp.*, No. 13-1130 (D. Md. Mar. 31, 2016) (Dkt. 119)), Verizon argues that the FCC treats such two-stage calls as a single, "end-to-end" call that terminates at the location where the person answers the telephone, and that as such, Peerless does not terminate the call because it hands the call off to the calling card platform rather than the end-user. *See* R. 162 at 25-26.

Peerless disagrees. It argues that the end-to-end approach relied on by *Broadvox-CLEC* was adopted before the advent of IP enabled services, and that because internet communications do not have a point of termination, "the fact that the VoIP provider 'may originate further telecommunications does not imply that the original telecommunication does not "terminate" at the ISP.'" R. 236 at 39–40 (citing *Bell Atlantic Telephone Co.'s v. F.C.C.*, 206 F.3d 1, 7 (D.C.C 2000)). Peerless argues that the FCC "has confirmed that ISP traffic is not governed by the end-to-end analysis, because a call to an ESP/ISP is 'a continuous transmission from the end user to a distant Internet site.'" *Id.* at 40–41. Peerless also cites the FCC's *Declaratory Ruling* in support, which concludes that a CLEC is entitled to charge switched access on calls destined to a VoIP partner:

> Specifically, under the ESP exemption, rather than paying intercarrier access charges, information service providers were permitted to purchase access to the exchange as end users, either by purchasing special access services or 'pay[ing] local business rates and interstate subscriber line charges for their switched access connections to local exchange company central offices' . . . the Commission has always

> recognized that information-service providers providing interexchange services were obtaining exchange access from the LECs.

*Declaratory Ruling*, ¶ 957 (citations omitted). In sum, the question boils down to whether two-stage calls "terminate" upon transfer to a VoIP provider, even if the call continues to an international number.

The *Broadvox-CLEC* court analyzed the FCC Orders and case law surrounding this issue. *See Broadvox-CLEC*, Dkt. 119, at 25-32. All that matters here is that the FCC eventually announced that jurisdiction over IP-transport calling card calls would be governed by the end-to-end analysis, meaning that calls made with prepaid cards that originate and end in the same state are intrastate, regardless of a call's actual route. *In the Matter of Regulation of Prepaid Calling Card Servs.*, 21 F.C.C. Rcd. 7290 at ¶¶ 10, 27 (2006), *vacated on other grounds by Qwest Servs. Corp. v. F.C.C.,* 509 F.3d 531, 534 (D.C. Cir. 2007). But the FCC did not discuss whether the end-to-end approach should be used to determine switched access charges.

After analyzing the state of the end-to-end approach, the *Broadvox-CLEC* court determined that the approach should be applied both for jurisdictional purposes (*i.e.,* to determine whether particular traffic is interstate to assess appropriate compensation) and non-jurisdictional purposes (*i.e.,* here, to determine whether Peerless can assess its terminating switched access charges). The court based its determination partly on the *Bell Atlantic* case. The *Broadvox-CLEC* court found that the D.C. Circuit in *Bell Atlantic* remained silent on whether the end-to-end approach could be applied beyond the jurisdictional analysis. *See Broadvox-*

*CLEC*, Dkt. 119, at *30 ("But, significantly, *Bell Atlantic* also does not hold that the end-to-end analysis cannot apply outside the jurisdictional context.") *Broadvox-CLEC* then relied on two FCC orders[33] to state that attempts to distinguish between the "jurisdictional" nature of a call from its status for "billing" purposes were unwarranted, and that as a result, the FCC "has made it clear that the end-to-end analysis applies for purposes of determining access charges, as well as for jurisdictionalizing." *Broadvox-CLEC* at 32.

The Court does not find *Broadvox-CLEC* convincing. It appears to oversimplify the D.C. Circuit's holding in *Bell Atlantic*, and it fails to recognize the important distinctions between services provided by traditional telecommunications providers and internet service providers ("ISPs").[34] As with the access stimulation claim and the VoIP issue, however, the Court refers this issue to the FCC in light of the D.C. Circuit's ruling in the AT&T Order, which may affect how CLECs charge for services provided with VoIP partners.

---

[33] *Teleconnect Co. v. Bell Tel. Co. of Penn.*, 10 FCC Rcd. 1626 (1995) and *In re Long Distance/usa, Inc.*, 10 FCC Rcd. 1634 (1995).

[34] The D.C. Circuit in *Bell Atlantic* was skeptical of using the end-to-end analysis outside of the jurisdictional context. *Bell Atl. Tel.,* 206 F.3d at 7 ("However sound the end-to-end analysis may be for jurisdictional purposes, the Commission has not explained why viewing these linked telecommunications as continuous works for purposes of reciprocal compensation."). The court was also skeptical of applying the analysis to ISPs. For example, the court noted the difference between traditional long-distance carriers and ISPs. *Id.* It explained that ISPs are not necessarily telecommunications providers, but may be information services providers, and that the FCC had not offered significant explanation as to why ISPs were not communications-intensive business end users selling products to other consumer and business end-users. *Id.* at 7-8 (vacating a ruling "[b]ecause the Commission has not provided a satisfactory explanation why LECs that terminate calls to ISPs are not properly seen as 'terminat[ing] ... local telecommunications traffic,' and why such traffic is 'exchange access' rather than 'telephone exchange service.'").

In practice, a primary jurisdiction referral means that the court either stays the case or dismisses it without prejudice, so that the parties may seek an administrative ruling. There is no formal transfer of the case. Rather, the parties are responsible for initiating administrative proceedings themselves. *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (citations omitted); *see Great Lakes Communication,* 2014 WL 2866474, at *15 ("When primary jurisdiction applies, a federal court may either stay or dismiss a claim in favor of the appropriate agency.").

Accordingly, Verizon's summary judgment motion regarding access stimulation, VoIP, and the 8YY calls against Peerless's collection claims is denied without prejudice. Verizon's Counterclaims I and III, which seek to recoup amounts paid by Verizon to Peerless under the Tariff and seek a declaration on Verizon's rights going forward under the Tariff, are stayed pending decision by the FCC on the access stimulation issue. If Verizon chooses not to file a complaint with the FCC on that issue by June 15, 2018, Verizon's Counterclaims I and III will be dismissed.

## IV. PEERLESS'S COLLECTION CLAIMS[35] (COUNTS III AND IV)

The conclusion that Verizon's arguments should be referred to the FCC under the primary jurisdiction doctrine does not end the Court's inquiry. It remains to be seen how that referral impacts Peerless's collection action to recover for switched access fees for which Verizon has refused to pay. Despite the complexity of the

---

[35] The Court refers primarily to the access stimulation claim and its effect on the Tariff in this section, but the reasoning in this section applies to the parties' dispute on the VoIP and 8YY issues as well.

subject matter, the volume of briefing devoted to the issue, and the number of

disputed issues of fact on which the parties' arguments are based, the crux of this

case is captured in a single sentence in Verizon's response to Peerless's statement of

additional facts, where Verizon states:

> Verizon admits that it did not challenge Peerless's rates with state commissions or the FCC, but *denies* any implication that *it had the obligation to do so*. Instead, *Peerless* had *the obligation* to file *lawful* tariffs with state commissions and the FCC.

R. 178-1, Resp. to PSOF, ¶ 17 (emphasis added). This admission raises a central

question: does Verizon have the right to unilaterally declare Peerless's Tariff

unlawful and then withhold payments otherwise required to be made under the

Tariff, without ever seeking an authoritative resolution of that issue through either

an action filed in court or a complaint brought before the FCC,[36] thereby

transferring the litigation burden to Peerless, which is required by law to continue

providing Verizon the services for which Verizon is refusing to pay? The Court turns

to that question now.

### A. THE FILED RATE DOCTRINE

Before the Tariff became effective, the parties that Peerless would bill under

it, including Verizon, had a fifteen-day window to object to the terms and rates set

out in that document. *See* 47 U.S.C. § 203(a)(3). The FCC itself could also reject,

suspend, or investigate the Tariff. *See* 47 C.F.R. § § 61.69; 61.191. Neither Verizon

---

[36] *See* 47 U.S.C. §§ 204–205 (granting the FCC the ability to either "upon complaint or upon its own initiative" determine the lawfulness, justness, and reasonableness of charges under the chapter).

nor any other party objected to the Tariff, and the FCC also took no action. *See* R. 73, Am. Compl., ¶ 40 ("Verizon had an opportunity to object to this tariff and/or any amendments or modifications thereto when they were filed but did not do so, and the FCC permitted this tariff to become effective without suspension."); R. 75, Verizon Answer, ¶ 40 ("Admitted that Verizon did not file objections with the FCC during the period between Peerless's tariff filings and Peerless's chosen effective date for those filings."). Verizon does not contest that Peerless filed the Tariff with the FCC, that Verizon received services under the Tariff, or that Peerless billed the rates set forth in the Tariff.[37]

"The filed-rate doctrine comes into play when an entity is required to file rates for its services with a governing regulatory agency and the agency has been given exclusive authority by federal statute to set, approve, or disapprove the rates." *First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*, 214 F. Supp. 3d 723, 731 (S.D. Ill. 2016) (citing *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 607 (7th Cir. 2013)). The doctrine forbids an entity from charging any rate that is different than the one properly filed and approved; this protects consumers from unreasonable or discriminatory rates. *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487

---

[37] *See* R. 176-1, Resp. to PSOF, ¶ 32 (responding "undisputed" to the statement that "Peerless's FCC Tariff No. 4 was initially filed . . . with an effective date of September 28, 2013"); *id.,* Resp. to PSOF, ¶ 15 (responding "undisputed" to the statement that Verizon "delivered traffic to, and received traffic from, Peerless's Network"); *id.*, Resp. to PSOF, ¶ 16 (responding "undisputed" to the statement that Verizon received services under the Tariff); *id.*, Resp. to PSOF, ¶ 47 (responding "undisputed" to the statement that, "[f]rom January 2010 through July 2015, the vast majority of Peerless's rates were addressed on a composite rate for the switch access functions identified in its tariffs").

(7th Cir. 1998); *see Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 867 (9th Cir. 2013) ("[T]he initial raison d'être for the doctrine concerned stabilizing rates and preventing pricing discrimination amongst ratepayers.").

More important to this case, the doctrine protects public utilities and other regulated entities from civil actions attacking rates that are subject to federal agency approval and disapproval, prevents courts from becoming "enmeshed in rate-making," and preserves "the agency's primary jurisdiction over reasonableness of rates." *First Impressions Salon,* 214 F. Supp. 3d at 731; *see also Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (a customer cannot ask the court in a civil rights or antitrust suit to invalidate or modify a rate); *Simon v. KeySpan Corp.*, 694 F.3d 196, 204 (2d Cir. 2012) ("Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers.") (citation omitted); *Alliance Commc'ns Co-op., Inc. v. Global Crossing Telecommunications, Inc.*, 2007 WL 1964271, at *3 (D.S.D. July 2, 2007) (under "[the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be the law and to therefore conclusively and exclusively enumerate the rights and liabilities as between the carrier and the customer." (quoting *Iowa Network Servs., Inc. v. Qwest Corp.*, 466 F.3d 1091, 1097 (8th Cir. 2006)) (internal quotation marks omitted).

The principle that a ratepayer may not seek to invalidate or modify a tariff rate in a collection action brought by the service provider serves the purpose of

preventing courts from becoming involved in rate-making, and preserves "the agency's primary jurisdiction over reasonableness of rates." *Arkansas Louisiana Gas Co.*, 453 U.S. at 577–78; *see Arsberry*, 244 F.3d at 562 ("[t]he filed-rate doctrine . . . is based . . . on historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently"). "[I]f customers were allowed to challenge the rate in court, varying litigation outcomes might result in non-uniform rates." *Simon*, 694 F.3d at 205; *see also Great Lakes Commun'c Corp.,* 2014 WL 2866474, at *13 ("The filed tariff doctrine prevents a court from awarding any form of relief that would have the effect of imposing rates other than those reflected in a duly-filed tariff.").

A straight-forward application of the filed-rate doctrine shows that Verizon has gotten it backwards. Verizon was required to pay the charges invoiced pursuant to the Tariff first. Then, Verizon could challenge those charges by either filing suit in federal court or filing a complaint with the FCC. *See Frontier v. AT&T*, 957 F. Supp. 170 (C.D. Ill. 1997) ("The prevailing rule is that a customer must pay filed rates before contesting them.").

Verizon responds that the filed tariff doctrine does not preclude all legal challenges to a tariff. That much is true. As the FCC has stated:

> [T]he Filed Rate Doctrine does not insulate tariffs from legal challenge. As we have previously stated, "it is well established that the rates and practices carriers seek to shelter pursuant to the Filed Rate Doctrine are always subject to an inquiry into their reasonableness." Where, as here, Commission determines that a tariff violates [47 U.S.C. § 201(b)], the Filed Rate Doctrine is no defense.

*In re Bell Atlantic-Delaware, Inc.* 15 FCC Rcd. 20665, ¶ 20 (2000). But the Court's ruling is not that Peerless's Tariff is unassailable simply because it went into effect without any legal challenge. Rather, the Court finds that Verizon had a duty to raise a legal challenge to the Tariff, not simply decide on its own that the Tariff was invalid and refuse for years to make payments under it.

Despite some ambiguity in FCC pronouncements on the issue, *Connect America Fund,* which established the access stimulation rule, supports the Court's view of the timing and burden issue with respect to Verizon's access stimulation challenge to Peerless's Tariff. *Connect America Fund* states that "enforcement of the new access stimulation rules in instances where a LEC meets the conditions for access stimulation but does not file revised tariffs" should proceed as follows:

> IXCs will be permitted to file complaints based on evidence from their traffic records that a LEC has exceeded either of the traffic measurements of the second condition, *i.e.*, that the second condition has been met. If the IXC filing the complaint makes this showing, the burden will shift to the LEC to establish that it has not met the access stimulation definition and therefore that it is not in violation of our rules. This burden-shifting approach will enable IXCs to bring complaints based on their own traffic data, and will help the Commission to identify circumstances where a LEC may be in violation of our rules.

*Connect Am. Fund*, 26 F.C.C. Rcd. 17663, ¶ 659; *see also id.,* ¶ 699 ("A complaining carrier may rely on the 3:1 terminating-to-originating traffic ratio and/or the traffic growth factor for the traffic it exchanges with the LEC as the basis for filing a complaint. This will create a rebuttable presumption that revenue sharing is occurring and the LEC has violated the Commission's rules.").

Had Verizon followed the procedure outlined by the FCC in *Connect America Fund*, and filed either a complaint with the FCC or a federal lawsuit challenging Peerless's Tariff as being in violation of the access stimulation rules, it could have sought temporary preliminary relief from making further payments of the challenged charges while the validity of Peerless's Tariff was being litigated. But instead of doing that, Verizon engaged in self-help. It withheld payments to Peerless for more than six years before the suit was filed based on its unilateral determination that Peerless's Tariff was in violation of the access stimulation rule. The *Connect America Fund Order* specifically mentions self-help as an approach some IXCs took:

> *Non-payment Disputes.* Several parties have requested that the Commission address alleged self-help by long distance carriers who they claim are not paying invoices sent for interstate switched access services. As the Commission has previously stated, "[w]e do not endorse such withholding of payment outside the context of any applicable tariffed dispute resolution provisions." We otherwise decline to address this issue in this Order, but caution parties of their payment obligations under tariffs and contracts to which they are a party. The new rules we adopt in today's Order will provide clarity to all affected parties, which should reduce disputes and litigation surrounding access stimulation and revenue sharing agreements.

*Id.*, ¶ 700. These comments show that the FCC does not approve of IXC self-help tactics. To the contrary, the FCC explains that such tactics fall "outside the context of any applicable tariffed dispute resolution provisions." While the FCC "otherwise"

declined to address the topic,[38] its comments clearly indicate that Verizon's unilateral approach to enforcing the FCC's access stimulation rules is in conflict with the filed rate doctrine. *See also CenturyTel of Chatham, LLC v. Sprint Commc'ns Co., L.P.*, 861 F.3d 566, 577 (5th Cir. 2017) ("FCC precedent makes clear 'self-help' is not necessarily permissible." (citing *In re MCI Telecomm.*, 62 F.C.C.2d at 705-06 ("We cannot condone MCI's refusal to pay the tariffed rate for voluntarily ordered services.")), *cert. denied sub nom. Sprint Commc'ns Co., L.P. v. CenturyTel of Chatham, L.L.C.*, 2018 WL 311841 (U.S. Jan. 8, 2018).

### B. VOID AB INITIO

Verizon further argues that its self-help strategy is supported by the FCC, because the FCC has said in a number of instances that a tariff not in compliance with the access stimulation benchmark is "void ab initio." According to Verizon, "void ab initio" means that Verizon never became obligated to pay the Tariff in the first place, and therefore the filed rate doctrine does not apply.

To begin with, the Court agrees with Peerless that Verizon's void ab initio argument is an affirmative defense to Peerless's collection action. To establish a right to recover under its Tariff, Peerless "must demonstrate (1) that [it] operated under a federally filed tariff and (2) that [it] provided services to [Verizon] pursuant

---

[38] The FCC may have thought it unnecessary to say more because it was optimistic that, "[w]ith the guidance in this Order, . . . parties should in good faith be able to determine whether the definition [of access stimulation] is met without further Commission intervention." *Connect Am. Fund*, 26 F.C.C. Rcd. 17663, ¶ 699. As it turns out, however, the access stimulation benchmark raises a number of interpretative questions, as discussed previously in this opinion, making it not so easy a benchmark to apply.

to that tariff." *Advamtel, LLC. v. AT&T Corp.*, 118 F. Supp. 2d 680, 683 (E.D. Va. 2000). Peerless has shown, and Verizon does not dispute, both of those things. Instead, Verizon argues that the Tariff is void ab initio because it is in violation of the FCC's access stimulation benchmark. R. 75, Counterclaim, ¶ 19 ("Peerless's federal tariff is therefore unlawful and, moreover, is void ab initio"). In other words, Verizon's void ab initio argument seeks to excuse or avoid Verizon's payment under the Tariff. It thus constitutes an affirmative defense.[39]

To make the case that its void ab initio argument is not an affirmative defense, Verizon inserts the requirement that Peerless prove as part of its prima facie case to recover under the Tariff that its Tariff is "lawful." But Peerless is required in its prima facie case to prove that the Tariff be "legal," not that it be "lawful." There is a difference between "legal" and "lawful" rates. The D.C. Circuit

---

[39] *See Van Schouwen v. Connaught Corp.*, 782 F. Supp. 1240, 1246 (N.D. Ill. 1991) ("An affirmative defense generally admits the matters alleged in a complaint but brings up some other reason why the plaintiff has no right to recovery. It thus introduces arguments not raised by a simple denial."); *see also Ft. Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1377 (7th Cir. 1990) ("The evidence necessary to establish a breach of warranty claim is significantly different from that required to prove the misuse of the baghouse or hindrance of the contract. . . . As such, the alleged defenses do not controvert Fort Howard's proof of breach of warranty and, therefore, are properly labeled affirmative defenses.") (citations omitted). Although Verizon did not assert an affirmative defense against Peerless's tariffs, the requirements of Rule 8(c), governing affirmative defenses, are not absolute and Verizon may assert affirmative defenses "as long as [Peerless] had adequate notice of the defense and was not deprived of the opportunity to respond." *Sterling v. Riddle*, 2000 WL 198440, at *4 (N.D. Ill. Feb. 11, 2000). "The purpose of the rule is to avoid surprise and prejudice to the plaintiff by providing him notice and the opportunity to demonstrate why the defense should not prevail." *Id.* (citing *Blonder–Tongue Labs., Inc. v. University of Illinois Found.*, 402 U.S. 313, 350 (1971)). Peerless does not argue it did not have adequate notice of Verizon's arguments or that it was prejudiced by Verizon's failure to plead it initially. The Court will address the argument on its merits.

explained the distinction between the terms "legal" rate and "lawful" rate in *ACS of Anchorage, Inc. v. F.C.C.*, 290 F.3d 403 (D.C. Cir. 2002):

> "Legality" mainly addresses procedural validity. "[T]o render rates definite and certain, and to prevent discrimination and other abuses," rates must be filed and published, and deviation from published rates is subject to criminal and civil penalties. *Arizona Grocery*, 284 U.S. at 384. A particular rate thus becomes "legal" when it is filed with an agency and becomes effective. But a rate's legality is not enough to establish its substantive reasonableness or "lawfulness." *See id.* (noting that a rate's legality does not abrogate "the common-law duty to charge no more than a reasonable rate"). A carrier charging a merely legal rate may be subject to refund liability if customers can later show that the rate was unreasonable. *Id.* Should an agency declare a rate to be lawful, however, refunds are thereafter impermissible as a form of retroactive ratemaking.

*Id.* at 410–11. As *ACS of Anchorage, Inc.* makes clear, the carrier's prima facie case for enforcement of a tariff requires that it show only that the tariff is legal, *i.e.,* properly filed and effective during the relevant time period. Consistent with it being an affirmative defense, it then is up to the ratepayer to allege and show that the tariff rate is "unreasonable," a standard the D.C. Circuit equated with the term "unlawful."

Verizon points out that the applicable regulation states that an access stimulator "*shall not* file a tariff" that fails to comply with § 61.26(g). *See* R. 162 at 19 ("Peerless violated the FCC's express directive that, as a traffic pumper, it '*shall not* file a tariff' that fails to comply with § 61.26(g).'" (emphasis in original)). According to Verizon, the FCC has explained that this regulatory language implements the FCC's "mandatory detariffing" policy, under which "a carrier *is*

*prohibited from* filing a tariff with rates above the benchmark." *Id*. (quoting *AT&T Servs. Inc. v. Great Lakes Comnet, Inc.*, 30 FCC Rcd 2586, ¶ 28 (2015) (emphasis added)). Verizon also cites to an amicus brief filed by the FCC in an appeal before the Third Circuit, where the FCC said that it adopted this prohibition because it "better serves the public interest" to prohibit such rates "from being tariffed in the first instance" than to "attempt [ ] to identify such unreasonable rates on an *ad hoc* basis after the tariffs are filed." *Id. (*quoting FCC Brief as *Amicus Curiae* at 27-28, in *PAETEC Commc'ns, Inc. v. MCI Commc'ns Servs., Inc.*, Case Nos. 11-2268, *et al.* (3d Cir. Mar. 14, 2012)). Verizon contends that the FCC's opinion in *Great Lakes Comnet* and its amicus brief in the *Paetec* case establish that filing a tariff that does not comply with the access stimulation rules "violates the Commission's Rules and renders the prohibited tariff void *ab initio*." *Id.* (quoting *Great Lakes Comnet,* 30 FCC Rcd 2586, ¶ 28; FCC *Amicus* Br. at 2)).

Verizon's reliance on the FCC's comments in *Great Lakes Comnet* and amicus brief in *Paetec* as support for its self-help strategy is misplaced. The void ab initio principle that the FCC discussed in its amicus brief in the *Paetec* case was addressing the question of whether the IXC—AT&T in that case—could recover payments made pursuant to the unlawful tariff. It was not addressing whether AT&T could unilaterally withhold payments to the CLEC based on its view that the CLEC had violated the access stimulation rules. Even though it was determined that the CLEC was an access stimulator without properly benchmarked rates, AT&T's right to recover charges that later were determined to be improper was at

issue because of the "deemed lawful" language in § 204(a)(3). As the D.C. Circuit

has explained:

> "[A] streamlined tariff that takes effect without prior suspension or investigation is conclusively presumed to be reasonable and, thus, a lawful tariff during the period that the tariff remains in effect." [*Streamlined Tariff Order*, 12 FCC Rcd 2170] at 2182, ¶ 19. In accordance with *Arizona Grocery*, these "deemed lawful" tariffs are not subject to refunds. If a later reexamination shows them to be unreasonable, the Commission's available remedies will be prospective only. *Id*. at 2182-83, ¶¶ 20–21. As the Commission emphatically recognized, § 204(a)(3) effected a considerable change in the regulatory regime: before, tariffs that became effective without suspension or investigation were only legal (not conclusively lawful), and thereby remained subject to refund remedies. *Id*. at 2176, ¶ 8.

*ACS of Anchorage, Inc.*, 290 F.3d at 411. It is to this situation that the FCC's void

ab initio argument applies. In other words, *Paetec* deals with how IXCs may recover

for tariffs "deemed lawful" but that are later deemed unreasonable by the FCC. It

does not hold that Verizon can engage in self-help and unilaterally withhold

payments to Peerless.

## C. RELATIONSHIP BETWEEN PEERLESS'S COLLECTION ACTION AND VERIZON'S RATE CHALLENGE

The Court must now determine whether to stay Peerless's collection action

until the FCC resolves Verizon's unreasonable rate claim. As explained by the court

in *Frontier Communications,* a claim by one carrier that a tariff is unlawful may be

raised only through a counterclaim and not as a defense to the other carrier's

collection action. 957 F. Supp. at 174 ("The Supreme Court has held that claims

challenging the reasonableness or fairness of common carrier rates asserted in

response to collection actions by the common carrier are properly considered counterclaims.") (citing *Reiter v. Cooper*, 507 U.S. 258, 262–63 (1993)).

In *Frontier*, the court held that AT&T had forfeited its right to raise an unreasonable rate counterclaim because it had previously filed suit before the FCC raising the same claim and the statute allowed it to proceed with its claim in only one forum. 957 F. Supp. at 175 (relying on *Cincinnati Bell Tele. Co. v. Allnet Commun'c Servs., Inc.*, 17 F.3d 921, 923 (6th Cir. 1994) (claims to recover unpaid access charges are counterclaims and run afoul of 47 U.S.C. § 207 if the customer has already filed a complaint relating to the same practices with the FCC)). Here, there is no indication in the record that Verizon has raised its unreasonable rate claim before the FCC. Therefore, Verizon may maintain its unreasonable rate counterclaim in this action. As the Court indicated earlier in this opinion, however, that claim must be referred to the FCC under the primary jurisdiction doctrine.

The Court declines to stay the case pending referral, following the path taken by the *Frontier* court. That court enforced the CLEC's tariff rates, leaving it to the FCC to decide AT&T's claim that Frontier's rates were appropriate. The *Frontier* court held that "[t]he only possible reason to delay a ruling until the FCC decides AT&T's claim is that AT&T might ultimately be entitled to a refund from Frontier of the amount this Court orders AT&T to pay. The risk that Frontier may someday have to pay AT&T back the money it receives in this proceeding is far outweighed by the potential damage that the delay would cause Frontier if the FCC ultimately upholds Frontier's rates." 957 F. Supp. at 176.

The balance of hardships in this case, like the balance in *Frontier*, weighs in favor of Peerless. Verizon could have challenged Peerless's rate by filing a claim before the FCC or in federal court at any time during the eight years that it withheld payments to Peerless on the belief that Peerless was engaged in access stimulation. It would be unjust, in these circumstances, to place Peerless's collection action on hold while waiting for a decision by the FCC on Verizon's access stimulation argument. The risk that Peerless may have to pay Verizon backdated charges is outweighed by the potential damages to Peerless from further delay in being paid if the FCC ultimately upholds Peerless' tariff against Verizon's access stimulation charge.

Peerless's collection claims on its federal tariffs (Counts III and IV) are granted. Peerless is directed to submit an itemized statement of charges owed, to which Verizon will be given an opportunity to respond before the Court determines the proper amount of damages. *See Frontier,* 957 F. Supp. at 177. The Court will enter a final judgment after the charges are determined. Peerless's declaratory judgment count regarding its interstate switched access services going forward (Count XI), is likewise granted in accordance with the discussion above.

V. **TANDEM SWITCHED ACCESS AGREEMENT (COUNTS I AND II)**

Peerless also seeks compensation for non-payment of the interstate and intrastate tandem switched access services that were provided and billed pursuant to the Tandem Services Agreement ("TSA").

To state a cause of action for a breach of contract under Illinois law,[40] Peerless must prove four elements: (1) a valid and enforceable contract exists, (2) substantial performance by Peerless, (3) breach by Verizon, and (4) damages resulting from Verizon's breach. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citations omitted).

There is no dispute that the TSA is a valid and enforceable contract. The TSA, signed in February 2009, provided Verizon a discounted rate on certain originating and terminating, interstate and intrastate, tandem switched access services in various states up through July 2014. R. 155, JSOF, ¶¶ 51–53; R. 178-1, Resp. to PSOF ¶ 23 (undisputed that the TSA provided discounted rates). Peerless issued invoices containing TSA rates corresponding to the amount of traffic billable for each particular month for the intrastate traffic, R. 178-1, Resp. to PSOF ¶ 29 (admitted), and Verizon used the services relating to these invoices. *See* R. 155, JSOF, ¶ 8.

Verizon also does not dispute that it breached the TSA. *See* R. 178-1, Resp. to PSOF, ¶ 27 (not disputing the existence of at least one unpaid invoice).[41] Instead, it challenges only the amount of damages appropriate for its breach. Verizon claims that Peerless failed to identify the exact charges or invoices Verizon failed to pay,

---

[40] Illinois law governs the TSA. *See* R. 160-5, Tandem Service Agreement, at Section 12.

[41] Throughout this litigation, Verizon had admitted it has withheld payments under the Tariff and the TSA. *See, e.g.*, R. 75, Verizon. Answer, ¶ 99 (admitting that Verizon continues to dispute and withhold amounts for switched access service charges).

that it never produced the damages figure in discovery, and that Peerless's damage calculation includes charges for which the statute of limitations has run. *See* R. 178 at 28–29. Peerless will have the opportunity to present the Court with evidence on the validity of the charges in later proceedings, using a procedure akin to the one described in the Court's ruling in Section IV.C. of this order.

Peerless's motion for summary judgment on Counts I and II is granted.

## VI. STANDSTILL AGREEMENT (COUNT X)

Finally, Verizon moves for summary judgment on Peerless's claim for breach of the Standstill Agreement. Verizon argues that Peerless has not produced any evidence that would allow a reasonable jury to conclude that Verizon breached that Agreement.

Peerless and Verizon entered into the Confidential Standstill Agreement in September 2013. R. 160-11, Standstill Agreement. The parties agreed that Peerless would continue to bill Verizon for charges that in "good faith" represent services rendered by Peerless, and that Verizon would pay any such charges that were not subject to a "good faith dispute." *Id*. at Section 2(b). Verizon acknowledged in the Agreement that it withheld payments on Peerless's charges, and Verizon has continued to withhold payments on Peerless's charges since the Standstill Agreement took effect. In its Amended Complaint, Peerless alleges that Verizon failed to pay Peerless's originating and terminated end office and tandem switched access charges for the period from April 2012 to June 2014. R. 73 (Am. Compl., ¶¶ 50–58.)

Peerless's claim for breach of the Standstill Agreement hinges on whether Verizon acted in good faith. Acting in good faith requires honesty in fact. *Gas Natural v. Iberdrola*, 33 F. Supp. 3d 373, 382 (S.D.N.Y. 2014).[42] But self-interest is not bad faith, and acting in a financial self-interest, or for a good faith business judgment, does not represent bad faith. Instead, "bad faith requires some 'deliberate misconduct'—arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment." *Id*. at 383. "Whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id*. (citations omitted).

As purported evidence of bad faith, Peerless cites Verizon's admission that it withheld payments for charges that it admits are payable without calculating what it believes it is owed under its counterclaim. *See* R. 236 at 45. Peerless also argues Verizon did not submit any dispute provisions in Peerless's tariffs for any of the charges at issue in this action. *Id*. Verizon disputes these allegations, arguing that it deducted amounts from current bills to recoup charges on unresolved disputes. *See* R. 178 at 24. Verizon says this is neither prohibited by the Standstill Agreement nor probative of bad faith.

As the Court held in its order on Verizon's Motion to Dismiss, nothing on the face of the Standstill Agreement prohibits Verizon from disputing charges paid

---

[42] New York law governs interpretation of the Standstill Agreement. R. 160-11, Standstill Agreement, at Section 10.

before the effective date of the Standstill Agreement. R. 69 at 17. Further, Peerless fails to present any concrete evidence showing that Verizon acted in bad faith under the Standstill Agreement. Instead, the undisputed evidence shows a disagreement as to the amount owed under Peerless's Tariffs and the TSA. Because Peerless has failed to present evidence, from which a reasonable juror could find bad faith and return a verdict in its favor on Count X, Verizon's motion for summary judgment on Count X is granted.

## Conclusion

For the foregoing reasons, the Court grants Peerless's motion for summary judgment (R. 170) on its collection counts (Counts III, IV). The Court grants Verizon's motion (R. 159) as to the Standstill Agreement, and denies it in all other respects. The Court refers the access stimulation, VoIP, and 8YY issues to the Federal Communications Commission, and accordingly stays Verizon's Counterclaims I and III.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 16, 2018